CÁRROLL *et al. v.* WRIGHT, comptroller-general, *et al.*

1. At a called session of the General Assembly, convened on the 29th day of August, 1908, under a proclamation by the Governor, an act was passed entitled "an act to provide a revenue to be used for the development and conduct of the penitentiary system of the State, and to buy farm lands and equipment as may be needed in connection with the management, control, and employment of the convicts of this State, by requiring a license to be obtained by all persons, firms, or corporations manufacturing or selling in this State or maintaining therein supply depots or places for distributing any imitation of or substitute for beer, ale, wine, whisky, or other spirituous or malt liquors; to prescribe the terms and conditions on which such licenses may issue and the amounts to be paid therefor; to prohibit the carrying on of any business for which such license is required without obtaining such license; to provide penalties for violations of this act; to provide for the forfeiture of the licenses provided for in this act when the same are used as a cloak for the violation of the law; and to appropriate the money raised hereunder, and for other purposes." *Held*, that the act is not unconstitutional on the ground that "said act does not relate to the object stated in the proclamation by the Governor convening the General Assembly at said called session," it appearing that the purpose of convening the legislature in special session was to consider legislation upon the disposition now and hereafter to be made of persons convicted of crime, including the establishment of a plan for the management, confinement, and labor of convicts, . . together with the raising of revenue and the appropriation of revenue to carry out such plans, and it appearing further that at this same called session legislation was enacted effecting the disposition of persons convicted of crime.

2. The act under consideration is not violative of paragraph 2, section 1, article 1 of the constitution of this State, on the ground that "it denies to the complaining parties the impartial and complete protection of person and property guaranteed by the constitution; for that it is arbitrary and seeks to classify certain forms of business, to impose taxes and license fees upon persons engaged in such business, while permitting other persons engaged in like and similar business to go untaxed and to be exempt from such license fees," it appearing that the classification of occupations by the act, for the purpose of imposing the tax in question, was neither unreasonable nor arbitrary.

3. The classification of occupations taxed by this act not being unreasonable or arbitrary, the act is not open to the criticism that it is unconstitutional because it would deprive the plaintiffs of their liberty and property without due process of law, and that it denies to plaintiffs equal protection of the law, "for that a tax is demanded, and it is made a crime to do business without procuring a license, only where imitations or substitutes are manufactured, kept, and sold for beer, ale, wine, whiskey, and other alcoholic, spirituous, or malt liquors. No tax is required, and it is not a criminal offense, to manufacture, keep, or sell any imitation or substitute for any other beverage."

4. (a) The fact that the plaintiffs are required to obtain a license of the ordinary, and that officer is entitled to enforce the payment of the tax by the issuance of process therefor, does not render the act repugnant to article 1, section 1, paragraph 23, of the constitution.

(b) The duty of issuing a license and collecting a tax being imposed by this act upon the ordinaries of the different counties of the State where the business taxed is carried on, it becomes the duty of such ordinaries to issue executions for the collection of the tax against delinquents. (ATKINSON and HOLDEN, JJ., dissent.)

5. The words "calendar year," as used in this act, mean the year from January the first to December the thirty-first, inclusive.

6. The act in question does not violate the constitutional inhibition against the passage of retroactive laws.

7. The act does not violate the constitutional provision that no law shall pass which refers to more than one subject-matter or contains matter different from what is expressed in the title thereof.

8. The expression "malt liquors," as used in article 8, section 3, paragraph 1, of the constitution, has reference to and was intended to include only such malt liquors as are intoxicating in their nature; and a special tax on persons engaging in the occupation of selling, storing, or manufacturing beverages which are an imitation of certain intoxicating malt liquors, and which imitations may be, as a matter of fact, made of malt and which are non-intoxicating, is not required to be set apart and devoted to the support of common schools under the provision of that paragraph just referred to.

9. The act is not unconstitutional upon any of the other grounds urged in the petition; and the judge below, under the pleadings and evidence in the case, did not err in refusing the injunction prayed for.

Argued November 4,—Decided December 10,—Rehearing denied December 22, 1908.

Petition for injunction. Before Judge Ellis. Fulton superior court. October 6, 1908.

This case comes by writ of error to the Supreme Court from Fulton superior court upon a judgment upholding the constitutionality of the act approved September 5, 1908, entitled "an act to provide a revenue to be used for the development and conduct of the penitentiary system of the State, and to buy farm lands and equipment as may be needed in connection with the management, control, and

employment of the convicts of this State, by requiring a license to be obtained by all persons, firms, or corporations manufacturing or selling in this State or maintaining therein supply depots or places for distributing any imitation of or substitute for beer, ale, wine, whisky or other spirituous or malt liquors; to prescribe the terms and conditions on which such licenses may issue and the amounts to be paid therefor; to prohibit the carrying on of any business for which such license is required without obtaining such license; to provide penalties for violation of this act; to provide for the forfeiture of the licenses provided for in this act when the same are used as a cloak for the violation of the law; and to appropriate the money raised hereunder, and for other purposes." In their petition the plaintiffs sought to have enjoined the enforcement of certain executions issued by John R. Wilkinson, ordinary, and placed in the hands of John W. Nelms, sheriff, and L. P. Thomas, deputy sheriff, for levy upon the property of the several plaintiffs. These executions were issued for the purpose of enforcing the collection of the taxes authorized by that act of the legislature. The judge below granted a temporary restraining order, and fixed September 23, 1908, as the time for the hearing of the motion for temporary injunction. On the date fixed the hearing was begun. The defendants filed both a demurrer and an answer. The plaintiffs, on September 25, 1908, and during the progress of the hearing, offered and caused to be allowed an amendment to their original petition.. The hearing was concluded on that date. The defendants introduced no evidence except the answer sworn to by John R. Wilkinson; the plaintiffs introduced certain evidence set out in the bill of exceptions. The court took the case under advisement, and, on October 6, 1908, rendered a judgment refusing and denying to the plaintiffs the injunction prayed for. This bill of exceptions is sued out to review the judgment denying the injunction. The act was passed at a called session of the legislature convened under a proclamation by the Governor on August 25, 1908.

*C. E. Dunbar, Walter R. Brown, R. B. Blackburn,* and *J. D. Kilpatrick,* for plaintiffs.

*John C. Hart, attorney-general,* and *Tye, Peeples, Bryan & Jordan,* for defendants.

BECK, J. (After stating the foregoing facts.)

1. It is provided in paragraph 13, section 1, article 5 of the

constitution of the State, that "He [the Governor] shall have power to convoke the General Assembly on extraordinary occasions, but no law shall be enacted at called sessions of the General Assembly except such as shall relate to the object stated in his proclamation convening them." Civil Code, §5816. Plaintiffs in error insist that the provision of the constitution just quoted was violated in the passage of the act under consideration; "for that said act does not relate to the object stated in the proclamation by the Governor, convening the General Assembly at said called session." A cursory reading of the proclamation convening the General Assembly must leave the impression on the mind that the act relates directly to the object stated in the call; and every subsequent reading of the proclamation, and the act passed by the General Assembly, must deepen that impression. No invocation of the usual presumptions, no strained interpretation of the terms of the act or its caption, or of the proclamation, is necessary in order to repel this attack upon the constitutionality of the act which it is sought to have declared null and void. The State was confronted with this situation: The disposition of the convicts, which had been made by the act first referred to in the proclamation, would expire March 31, 1909, and no legislative provision had been made for their disposition beyond that date. The regular session of the General Assembly for the year 1908 had come to a close, and that body had adjourned without the passage of any law having for its object the disposition of the convicts of the State, and the next regular session would not convene until June, 1909. Consequently, some action, looking to the disposition of the convicts upon the part of the lawmaking body, was absolutely necessary, and the General Assembly was therefore, by the Governor, in the exercise of the authority conferred upon him by the constitution, convoked at a called session, and the object stated in the proclamation convening the legislature was: "To consider legislation broadly upon the disposition now and hereafter to be made of persons convicted of crime, both misdemeanors and felonies, including the establishment of a plan or plans for the management, confinement, and labor of convicts, and including the undertaking of such work or works in connection with which convicts may be worked, together with the raising of revenue and the appropriation of money to carry out such plans, and to pro-

vide for the establishment of juvenile courts and reformatories."
The chief purpose of convoking the General Assembly, the object
of the call that stands out most boldly and fixes the attention, is,
of course, "the disposition now and hereafter to be made of per-
sons convicted of crime." Germane and incident to the purpose
broadly stated was the passage of such ancillary legislation as
might be properly considered necessary or incident to the execu-
tion of the main purpose in view, as set forth in the proclamation,
"the raising of revenue and the appropriation of money to carry
out such plans." Whether legislation for the purpose of raising
revenue was necessary for carrying out the object which the Gov-
ernor had in view when he convoked the General Assembly was
largely a question to be decided by that body; and it was within
their discretion to deal with the subsidiary question of raising rev-
enue necessary for carrying out plans contemplated for the dis-
position of the convicts, either before or subsequently to the pas-
sage of an act disposing of the convicts. It would have been
competent for the General Assembly to have shaped and passed
legislation embodying plans for the disposition of the convicts,
and then to have adjusted revenue measures to the plans already
crystallized in legislation; or, it was competent for them, before
dealing finally with the question of what disposition should be made
of the convicts, to provide a revenue the expenditure of which
would necessarily be involved in carrying out the legislative scheme
finally settled upon as the best solution of the main question which
they had before them, inasmuch as the legislature did, at this
called session and before the adjournment thereof, enact legisla-
tion upon the disposition to be made of persons convicted of crime.
In determining whether any given act passed at a called session
is germane to the object stated in the call of the Governor, his
entire proclamation convening the legislature in special session
must be considered. Chicago etc. Railroad Co. *v.* Wolfe, 61 Neb.
502 (86 N. W. 441); Mitchell *v.* Franklin & Columbia Turnpike
Co., 3 Humph. 455; State *v.* Shores, 21 W. Va. 491 (13 Am. St.
R. 875).

2. The contention that the act under consideration is violative
of paragraph 2, section 1, article 1 of the constitution of this
State, in that it denies to the complaining parties that impartial
and complete protection to person . . and property, guaranteed

by the constitution, "in that it arbitrarily seeks to classify certain forms of business, and to impose taxes and license fees upon persons engaged in such business, while permitting other persons engaged in like and similar business to go untaxed and to be exempt from such license fees," involves the determination of the question as to whether or not this act makes an unreasonable and arbitrary classification of the occupations and businesses affected by the imposition of the tax in question. "All taxation may be divided into two general classes: taxation on property, and taxation on person, the latter including taxation on occupation. Between the two classes there is a wide difference." *McGhee* v. *State,* 92 *Ga.* 21 (17 S. E. 276). It is competent for the legislature to make the classification of occupations and businesses for the purposes of taxation, but the classification must be reasonable and not arbitrary, and, in order to be valid, must be natural. *Mutual Reserve Association* v. *Augusta,* 109 *Ga.* 73 (35 S. E. 71). Whether the classification in a given instance is a reasonable one or not is a question primarily addressed to the judgment and discretion of the taxing power, subject to review by the courts whenever, in a court having jurisdiction of the same, the question is raised as to whether or not the classification is unreasonable and arbitrary; but when that question is raised for adjudication, the court will, in passing upon it, keep constantly in mind the established doctrine that the legislative body imposing the tax had, in passing upon the question primarily submitted to its judgment, a very wide discretion in the exercise of its judgment in the first instance. *City Council of Augusta* v. *Clark,* 124 *Ga.* 254 (52 S. E. 881); Judson on Taxation, §438, et seq. See also Gray on Limitations of Taxing Power, § 1403 (a). Keeping before us this principle that the legislature has, in the classifications of occupations and callings, the right to exercise its judgment and discretion, this court can not hold that the legislature transcended its power in making, for the purpose of imposing a tax, a distinct class of those persons who engage in the business of selling non-intoxicating beverages which, while non-intoxicating, are an "imitation of or substitute for beer, ale, wine, whisky, or other spirituous or malt liquors." It does not seem that to make a distinction for the purpose of classification between beverages of that kind and the beverages which are usually, as a matter of common knowledge,

sold at soda founts, like ginger-ale and carbonated water, sweetened and flavored with various fruit juices and syrups, is either arbitrary, unnatural, or unreasonable. The fact that the beverages and drinks referred to in the act under consideration are beverages and drinks made in imitation of or as a substitute for intoxicating liquors suggests at once an answer to the question, propounded in one of the briefs of counsel for plaintiffs in error, as to why "near beer" should be divided and separated from other beverages of the "soft-drink family." It requires no refinement of reasoning, nor subtle argument, nor discussion of the nature and causes of thirst, to point out and show that the beverages the vendors of which are singled out for taxation here may justly have been regarded by the lawmaking body as constituting a class distinct from other beverages, in that they would appeal to and were capable of satisfying an artificial thirst and taste which was the result, possibly, of long indulgence in the habit, upon the part of the purchasers, of drinking spirituous or malt liquors, and of satisfying such thirst or craving to such an extent as made them more readily vendible, and their sale, in consequence, more profitable than that of other members of the "soft-drink family." And if the legislature was right in taking this view of the question, their legislative enactment to meet the situation, instead of being violative of the spirit of those provisions of the constitution which we have referred to above, is in keeping and harmony with them.

3. It is further contended in the petition, that "Said act is null and void, because it is in conflict with article 1, section 1, paragraph 3 (Civil Code, §5700), of the constitution of this State, and is likewise in conflict with the fourteenth amendment of the constitution of the United States (Civil Code, §6030). Said act would deprive plaintiffs of their liberty and property without due process of law, and denies to plaintiffs equal protection of law; for that a tax is demanded, and it is made a crime to do business without procuring a license, only where imitations or substitutes are manufactured, kept, and sold for beer, ale, wine, whiskey, and other alcoholic, spirituous, or malt liquors. No tax is required, and it is not a criminal offense, to manufacture, keep, or sell any imitation or substitute for any other beverage, and there are numerous other beverages that are imitations and substitutes for still other beverages. The classification is arbitrary and unreasonable."

If we are right in holding that the legislature did not, in the passage of this act, transcend their powers of making classification of occupations, and subjecting the particular occupations referred to in the act to taxation, then it necessarily follows that the ground of attack last referred to, on the constitutionality of the act, is not tenable. Having made a classification which was not unreasonable and arbitrary, but which was natural, in view of the nature of the subject dealt with, then it was perfectly competent for the legislature to make provisions for enforcing the payment of the tax imposed; and if these provisions were the same as to each member of the class made by the act, the constitutional provisions appealed to in the particular part of. the petition immediately under consideration have not been offended against. The discussion in Central Ry. Co. *v.* Wright, 207 U. S. 127 (28 S. C. 34, 52 L. ed. 143), relates to due process of law in respect to notice and hearing in the collection of a property tax. In the instant case we are considering a tax upon a business or occupation; and what was said in the case of *McGhee* v. *State,* supra, is so closely in point, both as to the precise question in this and in the preceding division of this opinion, that the language of a part of that decision may here be appropriately quoted: "This brings us to the next objection, viz., that the act does not deal uniformly with all persons liable for taxes on their occupations. For instance, the act does not require *all* persons taxed on their occupations to register or to pay in advance, or make a failure to do so indictable. While, under the constitution, the legislature has no power to make any classification as to property subject to taxation, but must deal substantially in the same manner, as to taxes, with all kinds of property, there is nothing in that instrument which forbids the legislature from classifying persons, privileges, and occupations which are to be subjected to taxation, except, perhaps, as to poll taxes, provided, of course, that 'all taxation shall be uniform on the same class of subjects.' . . We therefore think the legislature may omit from its system of taxation on vocations many occupations altogether. It certainly does this, and, in our opinion, there can be no doubt of the wisdom and propriety of such action. We think, further, that occupations which are taxed may be divided into various classes. It would not be expedient, necessary, or just to subject all occupations to the same amount

of taxation, or to the same provisions as to enforcing payment. This will be obvious without entering into details. When, however, the legislature does make a distinct class, it must treat each member of it alike. It could not provide that some lawyers, some physicians, or some liquor-dealers must register and pay their taxes in advance, and be indictable for failing to do either, and relieve other lawyers, physicians, or liquor-dealers from these provisions. When it makes a class of lawyers, physicians, liquor-dealers, dealers in 'futures,' or any other class, including one or more occupations, the same provisions must be made as to each member of the class. . . Looked upon as a legislative question, some occupations ought not to be taxed at all; others should be taxed to a certain extent; and others to a still greater extent; and the requirements as to collections, etc., should in some instances be more stringent than in others." See also Gray on Lim. of Taxing Power, §§1138-9. When an act of the legislature imposes a tax upon a given occupation, it is not rendered unconstitutional because it does not provide for a trial and hearing, in advance, upon the question of the liability of the person sought to be taxed to the tax in question. One against whom process to enforce payment is issued and is proceeding, if he denies that he belongs to the class taxed or that he is otherwise liable, would not, under our law, be without remedy.

4. Plaintiffs in error assail the constitutionality of the act on the ground that it is in conflict with article 1, section 1, paragraph 23, of the constitution of this State (Civil Code, §5720), and with article 6, section 6, paragraphs 1 and 2, of the constitution of this State (Civil Code, §§5852, 5853), in that said sections declare the courts of ordinary are a part of the judiciary of Georgia, and under the constitution the judicial, legislative, and executive departments shall remain separate and distinct. We do not think the act in conflict with the clause of the constitution last referred to. This becomes more apparent upon an examination of the history of the office of ordinary and of the court of ordinary, as well as that of the inferior court, and the justices of that court, who are sometimes referred to as the predecessors of the ordinary, giving, as we should, due regard to contemporaneous and continued construction placed by all departments of the government upon the laws and constitutional provisions relative to the said offices

and the officials occupying them. *Epping* v. *Columbus,* 117 *Ga.* 263 (43 S. E. 803). The first constitution adopted by the State in 1777 contained the provision that "The legislative, executive, and judiciary departments shall be separate and distinct, so that neither exercise the powers properly belonging to the other." Marbury and Crawford's Dig., p. 6. The constitution of 1789 did not contain this distinct provision, but recognized the separation of the departments of government. Thus article 1, section 1, declared that "The legislative power shall be vested in the general Assembly," and article 2, section 1, declared that "The executive power shall be vested in a Governor." Mar. & Craw. 14, 15. The constitution of 1798, article 1, section 1, provided as follows: "The legislative, executive, and judiciary departments of government shall be distinct, and each department shall be confided to a separate body of magistracy; and no person, or collection of persons, being of one of those departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." Mar & Craw. Dig. 20. In article 3, section 6, it was said that "The powers of a court of ordinary or register of probates shall be vested in the inferior courts of each county." Ib. 28.

The justices of the inferior courts always performed certain ministerial acts, especially those pertaining to the county business, and the legislature from time to time conferred upon them these and similar duties. While an act of the legislature in plain conflict with the constitution will be held to be void, and the mere fact that the legislature has enacted a law will not be conclusive of its constitutionality, and can not change the constitution, yet a uniform contemporaneous construction of a constitutional provision, and a recognition by all three departments of the government of such a construction as applicable to a particular officer will be given due weight in determining the constitutionality of an act in regard to his duties or functions. The inferior court and its justices were the predecessors of the court of ordinary and during the long period of their existence the legislature frequently imposed upon them certain duties which were not strictly of a judicial character. They performed administrative acts in connection with county affairs, as well as exercised the powers of a court of probate. The justices of that court were recognized by all

three departments of the government for many years as lawfully and· constitutionally exercising certain administrative functions. We will cite only a few of the illustrations which might be given. In 1791 an act was passed for the granting of tavern licenses by the justices of the inferior court. Mar. & Craw. Dig. 445. In 1796 the county of Jefferson was laid out from parts of Burke and Warren counties, and the county of Lincoln was laid out from a portion of Wilkes county. In that act the justices of the inferior court were authorized to levy a tax, and in the latter case to make a contract for the erection of public buildings. Id. 169. In 1799, the year following the adoption of the constitution of 1798, an act was passed which declared in its caption that it was for the purpose of carrying into effect a section of that constitution on the subject of courts of ordinary, the duties of which were vested in the inferior courts. Among other things, it declared that the clerks of the courts of ordinary should grant marriage licenses (which was authorized by the constitution), and that it should be lawful for any judge, justice of the inferior court, justice of the peace, or minister of the gospel to perform the ceremony. Cobb's Dig. 281. If the constitution were to be strictly construed as it is now insisted shall be done, it might be argued with much force that the performance of the marriage ceremony was not strictly a judicial act, and that ceremonies performed by judges or magistrates were invalid. In 1814 the inferior courts were authorized to appoint flour inspectors in certain counties, and to regulate such inspection. Cobb's Digest, 19. In 1805 and 1818 acts were passed to alter and amend the road laws of the State. By them certain duties of the justices in regard to roads, bridges, and ferries were defined (Cobb's Dig. 945, 946), though the power to alter and lay out public roads was not then for the first time conferred upon the justices of that court. By the acts of 1804, 1810, and 1815, duties in regard to county taxes and the issuance of executions therefor, and against defaulting tax-collectors for taxes due the State or county, were required of the justices of that court. Cobb's Dig. 1053, 1056, 1062. Instances might be cited at great length; but these will suffice to show a uniform legislative construction that the justices of the inferior court were not so exclusively judicial officers that certain administrative duties could not be required of them. Both the executive and judicial depart-

ments of the government also recognized those officials as lawfully performing certain administrative acts. So far as we are aware, this was uniformly and invariably recognized from the earliest history of the inferior court to its abolition. In 1852 (carrying out a previous constitutional amendment) the powers of a court of probate were conferred upon the ordinary, though the inferior court was not abolished. By the constitution of 1868 the court of ordinary was recognized. The language there employed in regard to the powers of that court is perhaps somewhat broader than that of the constitution of 1877; but it was there provided that the inferior courts should be abolished, and their unfinished business and the business of the justices thereof should be transferred to such tribunals as the General Assembly might designate. Code of 1873, §5126. But it was also declared that the books and proceedings of the inferior courts should be transferred and remain in control of the ordinaries, who should perform the duties of said courts until otherwise provided by law. Section 5149. Under this, the ordinary had duties in regard to wills, letters of administration, guardianship, and the like, and also certain duties in regard to county matters. Code of 1873, §§331, 337. The constitution of 1877, while classifying the court of ordinary with the judicial department of the State, still recognized the propriety of conferring upon it or the ordinary administrative powers in regard to roads, bridges, ferries, public buildings, paupers, county offices, county funds, county taxes, and other county matters. Civil Code, §§5852, 5853. This enumeration of county matters appears to have been made so as to affirmatively show that the ordinary was not excluded from exercising such functions in regard to the counties where county commissioners were not created, rather than to indicate a restrictive policy of excluding any other duty which might be legitimately placed upon him by the legislature. This was no doubt rendered desirable, because by the constitution of 1877 authority was given to establish county commissioners. During all the time since the creation of the office of ordinary, and the conferring upon him of the duties of the justices of the inferior court, the placing upon him of certain administrative duties has been steadily adhered to and recognized.

In the Code of 1863 and ever since then it has been declared that marriage licenses may be granted by "the ordinaries or their

deputies." Code of 1863, §1659; Civil Code of 1895, §2417. Now, the issuing of marriage licenses is not essentially and absolutely a judicial act; but it will hardly be claimed that every marriage license which has been issued by an ordinary is invalid. Numerous other duties have been placed upon the ordinary by the legislature; such as the selling of lots of land which had not been granted and remitting the proceeds to State treasurer (Acts 1872, p. 57) ; the ordering of elections in reference to fences or no fences, and the deciding of questions in regard thereto, and the declaring of the result (Political Code, §§1777, 1778) ; duties in regard to local-option elections prior to the prohibition act of 1907 (Pol. Code, §§1541 et seq.), and others which might be cited. Indeed, prior to the act of 1907, prohibiting the sale of liquors in Georgia, liquor dealers were required to register with the ordinary, though it was then provided that the tax should be paid to the tax-collector (Pol. Code, §§790 et seq.) ; and it was required that the seller should obtain a license from the ordinary or county commissioners, who should have power to grant or refuse it (Political Code, §1519). So that the provisions requiring what are now commonly known as "near-beer" dealers to obtain a license from the ordinary is not so unusual or peculiar as to raise a plain conflict with the constitution, as it has been long interpreted by all three branches of the government. While unquestionably the legislature can not plainly violate the constitutional declaration on the subject of the separation of the three departments of the government, yet it must not be forgotten that there are certain classes of acts which do not necessarily fall within the duties of one department rather than another; and in the light of the history of the governmental practice which has been stated above, it can not be held that the act of 1908 was violative of that constitutional provision.

As early in the history of the Supreme Court as 1850, in the case of *Beall* v. *Beall,* 8 *Ga.* 210, the question of the absolute separation of the departments of government was considered. There an act of the legislature legitimating certain children was under consideration. In discussing whether such an act was inherently judicial or could be done by the legislature, it was said that "The separation is not, and, from the nature of things, can not be total." The ruling there made is abundantly sustained by the

principle involved in several adjudicated cases. In *Powers* v. *Inferior Court of Dougherty County*, 23 *Ga.* 65, it was held that "The act of 1855, 'to authorize the County of Dougherty to aid in constructing the Georgia and Florida Railroad between Albany and Americus, or any other railroad running to said county, by the subscription for stock, and the issue of bonds therefor, upon a vote of the citizens,'" was constitutional, one ground of attack being that it sought to confer legislative duties upon the county authorities. In *Russell* v. *Cooley;* 69 *Ga.* 215, it was held that an act which made it the duty of the judge of the superior court of Chatham county, the judge of the city court of Savannah, and the ordinary of Chatham county to appoint three freeholders residing in each militia district in the city of Savannah, who were to constitute a board of registration and election managers for that city, was not violative of the clause of the constitution now under consideration. In *Johnson* v. *Jackson*, 99 *Ga.* 389 (27 S. E. 734), it was held that the act of 1893, designating the judge of the superior court as the officer who should preside and hear certain contests of elections, was not obnoxious to the constitutional provision before us. In *Phinizy* v. *Eve,* 108 *Ga.* 360 (33 S. E. 1007), it was held that the act of 1881, establishing a city court in the county of Richmond, and providing that the judge thereof should be ex-officio commissioner of roads and revenues of that county, was not open to attack on the ground that it sought to confer upon a judicial officer legislative functions. See also *Mayor etc. of Americus* v. *Perry,* 114 *Ga.* 871 (4), 881-2 (40 S. E. 1004, 57 L. R. A. 230). It might have presented a more harmonious scheme for the collection of the taxes imposed by the act, the constitutionality of which is involved in this decision, to have required the tax-collectors to collect the tax. But since the persons taxed by this act are required to obtain a license from the ordinary, "and shall pay therefor" a specified sum, and no other person is named in the act to receive the payment of the tax, it becomes, by necessary implication, the duty of the ordinary issuing the license also to receive and collect the tax. "The legislature is left free by the constitution to provide the methods of collecting lawfully-imposed taxes. It may provide methods which greatly mar the general symmetry of the tax laws, and design a tax-enforcing scheme for a partic-

ular purpose which is out of harmony with the customary manner of collecting taxes, so long as there is no constitutional inhibition. . . Such matters are for legislative discretion; and if that branch of the government deems it fit by a general law to confer on different officials the power to enforce the payment of different taxes imposed on the taxpayer, the procedure is legal if the tax is legal and has been assessed according to law." *Georgia Railroad & Banking Co.* v. *Hutchinson,* 125 *Ga.* 762 (54 S. E. 725). And since it is incumbent upon the ordinary to issue license and collect the tax in question, it becomes the duty of that officer to issue an execution against the delinquent who fails to pay the occupation, business, or license tax imposed by this act. The duty of issuing the execution and the authority to do so is found in the act approved July 16, 1903, and entitled "An act to provide for the collection of the revenue of the State arising under special occupation license taxes, the issuing of executions therefor, and for other purposes." The first section of this act provides, "That in addition to the remedy heretofore given the State for the collection of special occupation and license taxes due the State by persons following the occupation and failing and refusing to pay the tax or license, as well as for any taxes that may now be due the State as occupation or license tax, it is made the duty of the officer charged with the collection of said tax or license, where the same is now due, or may hereafter become due, to issue an execution against such delinquent taxpayer for the amount of said occupation or license tax." (Acts 1903, p. 17.) The conference upon the ordinary of the power to issue an execution for a special tax is not altogether a new or novel procedure. See Pol. Code, §1525.

5. Section two of the act provides that "Every person, firm, or corporation who shall maintain a supply depot, warehouse, distributing offices, or other place of business within the limits of this State, where such beverages, drinks, or liquors as are referred to in the first section of this act are kept for sale or distribution in wholesale quantities, that is to say, in quantities of more than five gallons, shall obtain a license so to do from the ordinary of the county wherein such depot or other place is kept, and shall pay therefor the sum of five hundred dollars ($500.00) for each calendar year or part thereof." And section three con-

tains a similar provision as to obtaining a license by those who shall sell or offer for sale quantities of less than five gallons of the beverages referred to in the act. Counsel for plaintiffs in error contend that the expression "calendar year," as used in this section of the act, means a period of twelve months, commencing at any fixed or designated month and terminating with the day of the corresponding month in the next succeeding year thereafter; while counsel for defendant in error insist that the words "calendar year," as used in these two sections, mean the year from January 1st to December 31st, inclusive; and, considering the context and the subject-matter of the act, we are of the opinion that the latter construction of the words in the expression quoted is the correct one. The construction which we have adopted of the expression under consideration is that already placed upon that expression by this court. In the case of *King* v. *Johnson,* 96 *Ga.* 497 (23 S. E. 500), it was said: "Section 5 of the Code declares that the word "year" means a calendar year. Ordinarily, then, this is the meaning to be ascribed to this word. We are not aware of any statute varying this meaning in such a case as that now in hand; and therefore we hold that an administrator may, if he sees proper, without an order of the court, continue the business of his intestate to the end of the calendar year in which the latter died, but not longer, without an order of court, except at his peril. . . If it should be necessary, or to the interest of the estate, to continue the business longer than the calendar year, the administrator should make this appear to the court of ordinary, and obtain the proper order in the premises." We are strengthened in this view of the matter by the consideration that we are dealing with a question pertaining to the fiscal affairs of the State; and the Political Code, § 202, provides that "The fiscal year in this State shall commence on the first day of January, and end on the thirty-first day of December, of each year; and all public officers of this State shall keep their official accounts in accordance therewith." See, in this connection, the case of *City of Dawson* v. *Waterworks Co.,* 106 *Ga.* 696 (32 S. E. 907); Acts of 1903, p. 25. It would seem, from the use of the words "for each calendar year or part thereof," by the legislature, that it was the purpose of that body that if a person saw fit to engage in the business or occupation upon which

the tax is imposed by this act, he should pay the full amount of the tax which would be exacted for the full year of twelve months, and that a license, if issued after the first of the year, would only extend to the beginning of the next calendar year, that is to the first day of January of the ensuing year.

6. If the construction which we have given to the expression "calendar year," as used in the act, be correct, then the act is not void on the ground that it is in conflict with article 1, section 3, paragraph 2, of the constitution (Civil Code, §5730), "for that it is retroactive and seeks to levy a tax for the year 1908, when said law was passed after more than two thirds of the year 1908 had elapsed." The classification of occupations for the purposes of taxation, as made in the act, not being unreasonable and arbitrary, it was competent for the legislature to enact that a person entering upon the business or occupation upon which the tax provided in this act had been imposed, by the terms thereof, should pay the amount of the tax named for the year, or for any period of time within the year, during which he should choose to apply for a license. This was a matter in regard to which the lawmaking body was called upon to exercise its collective wisdom and judgment. We do not and should not canvass the question as to whether the conclusion reached by them was authorized by all the facts and circumstances that were presented for their consideration. Under the phraseology of this act, it was evidently the purpose and intent of the legislature that all persons entering into and following the business referred to in the act, after its passage, before the expiration of the year in which it was passed, should pay the amount of the tax specified for the unexpired portion of the year.

7. Petitioners further aver that the act is null and void, "because it conflicts with article 3, section 7, paragraph 8 (Civil Code, §5771), of the constitution of this State, in the following particulars, to wit: 1st. The caption of the act seeks to regulate imitations and substitutes for beer, ale, wine, whiskey, and other malt liquors, while the body of the act, in addition to the things above enumerated in the caption, seeks to regulate and tax imitations [of] and substitutes for alcoholic liquors. 2nd. Said act deals with more than one subject-matter, in that it attempts to provide for the levying of a tax, and at the same time provide

for the appropriation of the revenue arising from said tax." The paragraph of the constitution here referred to provides that "No law or ordinance shall pass which refers to more than one subject-matter, or contains matter different from what is expressed in the title thereof." And if the act refers to more than one subject-matter, or contains matter different from what is expressed in the title thereof, it is, of course, unconstitutional. But where it is urged that an act is unconstitutional on the ground that it contains matter different from what is expressed in the title thereof, the objection should be serious, and the conflict between the statute and the constitution plain and unmistakable, before the judiciary would be authorized to declare the legislative enactment null and void. *Hope* v. *Gainesville,* 72 *Ga.* 246. And the same principle is to observed when passing upon a question as to whether or not an act is contrary to the constitutional inhibition against the passage of a law which refers to more than one subject-matter. Ibid. p. 246. There is no hard and fast rule by which the questions just stated can be determined. While the question as to whether the body of the act contains matter different from what is expressed in the caption thereof is not entirely free from difficulty, we are of the opinion that when it is taken into consideration that the enumeration of the beverages or drinks of which the manufacturing, storing, or selling renders those persons manufacturing, selling, or storing liable to the tax in question embraces practically all the beverages containing alcohol, the introduction of the word "alcohol" in the body of the act does not introduce matter so different from that in the caption that the act itself should be deemed violative of the constitutional provision just referred to. "The meaning of the constitutional requirement is that the title and the act must correspond, not literally, but substantially; and this correspondence is to be determined in view of the subject-matter to which the legislation relates." *Macon & Birmingham Railroad Co.* v. *Gibson,* 85 *Ga.* 1 (11 S. E. 442). The enumeration of beverages or drinks in the caption in terms embraces "beer, ale, wine, whisky, or other spirituous or malt liquors," and indicates that the entire family of drinks which are imitations of or substitutes for vinous, spirituous, alcoholic, or malt liquors is to be the subject of legislation. *Bell* v. *State,* 91 *Ga.* 227 (18 S. E. 288) ; Allred *v.* State, 89 Ala.

112; 26 Am. & Eng. Enc. L. 151; State *v.* Giersch, 98 N. C. 720. Nor do we think that the act is open to the criticism that it refers to more than one subject-matter. The general purpose of the act, as broadly stated in the caption, is to provide a revenue to be used for the development and conduct of the penitentiary system of the State. And it would seem that the imposition of a tax upon subjects liable to the same, and the appropriation of the money arising therefrom to the doing of the things needful for the development and conduct of the system contemplated, might, very properly, both be embraced in the general subject broadly stated as above. Nor is there any constitutional inhibition against the raising and the appropriation of revenue for a specific purpose in the same act; and it would seem that this might be very appropriately done in an act like the one under consideration, where the sole purpose of raising the revenue contemplated by the act is for the single object to which the appropriation is made.

8. The constitutional provision, now embodied in article 8, section 3, paragraph 1, is to be found first in the constitution of 1868. An examination of the law as it stood at the time of the adoption of that constitution, on the subject of the sale of liquor, the licensing of the sale, the inspection thereof, and other laws to be found in Cobb's Digest and in the Code of 1868, of which we will not here attempt to make a summary, satisfies us that the framers of the constitution, in the use of the expression "malt liquors," had reference to and intended to include only such malt liquors as are intoxicating in their nature. And the tax imposed by the act under consideration, on beverages which are an imitation of certain intoxicating malt liquors, though the imitations may be made of malt, as a matter of fact, is not required, by the terms of the clause of the constitution now under consideration, to be devoted to the support of common schools. Having reached this conclusion and given this construction to that portion of the constitution in question, it is unnecessary to take up and discuss the contention of counsel for defendant in error that the tax contemplated by this constitutional provision was a tax on property, and not an occupation tax.

9. The last ground of attack upon the constitutionality of the act is as follows: "Said act is null and void, because it denies to plaintiffs equal protection in law, and because it is class legisla-

tion, and because it denounces a penalty and forfeiture, and makes no provision for a hearing or judicial adjudication before the infliction of the penalty, and before declaring the forfeiture, and because it denies to plaintiffs and persons similarly situated the right to pursue their ordinary callings and avocations, without being subjected to unusual and harsh penalties and punishments for doing things usually and generally permitted to other persons following like and similar callings and vocations. It is specifically alleged that said act confers upon the ordinary no authority to hear or adjudicate any question of forfeiture arising under said act." It will be observed that this ground, where its allegations are not too vague and indefinite to raise any question for decision, is practically a summary of the grounds already specifically dealt with. If the classification of occupations made by the act is valid, and the burden of taxation laid upon each member of the same class is not discriminatory but uniform, there being nothing in the method of collecting the tax of which plaintiffs in error can complain, they are not denied the equal protection of the law.

As we have already said, the tax sought to be collected is a business or occupation tax. Due process of law can not be said to be denied the petitioners because they are required to obtain a license before entering upon and engaging in the occupations enumerated in the act. The decision in the case of Central of Georgia Railway Co. *v.* Wright, 207 U. S. 127 (28 Sup. Ct. 47, 52 L. ed. 47), as we have pointed out above, does not sustain the contention of plaintiffs in error, and is not in point upon the constitutional questions made in the attack made upon this act imposing, not a tax upon property, but upon an occupation or business.

The contentions of plaintiffs in error not specifically dealt with in this opinion are involved in the decision of those issues and questions which have been taken up and passed upon. Some of the questions raised in this case are not free from doubt, and in upholding this act we have had to apply the doctrine that all doubts are to be resolved in favor of the constitutionality of a law which is assailed as being unconstitutional.

Under the evidence in the case and the law, the judge below did not err in refusing the injunction.

*Judgment affirmed. All the Justices concur, except*

ATKINSON and HOLDEN, JJ., dissenting. The majority holds that the ordinary was the proper officer to issue executions for collection of the special tax authorized by the act in question. We can not concur in that conclusion; and as the contrary view demands a reversal of the judgment of the lower court, we are constrained to dissent. The ruling by the majority proceeds upon the theory that the act imposes upon the ordinary the duty of collecting the tax; and though there is no express provision that he may issue executions against delinquent taxpayers, such power exists as an incident to the power to collect. That position is untenable, because the ordinary has not the power to collect. The only provisions of the act relied on as conferring the power upon the ordinary to collect are, in effect, that every person engaged in the business taxed by the provisions of the act "shall obtain a license so to do from the ordinary of the county" wherein such business is to be carried on, "and shall pay therefor the sum" specified in the act; and that "all moneys collected under the provisions of this act shall be accounted for and paid over to the treasury of the State, to be there held as a special fund to be used only in the development and conduct of the penitentiary system of the State," etc. It will be noted that these provisions authorize the ordinary to issue licenses, but manifestly do not expressly, and, as we contend, do not by implication, authorize him to collect the special taxes. There are general laws which impose the duty upon tax-collectors to collect special taxes of the character mentioned in the act. Among the subdivisions of Political Code, §949, the following occur: "It is the duty of the tax-collector: 1. To diligently collect and promptly pay over in the funds allowed by law the State and county taxes to the comptroller-general and the county treasurer, respectively. . . 10. In collecting the special tax that may be levied year after year on dealers in intoxicating bitters, or other articles of like character, and upon dealers of spirituous, vinous, and malt liquors, or any other person liable to special tax, to report the name of the person or firm paying said tax, the amount paid, and the date of such payment, to the comptroller-general at the time of paying said special tax into the State treasury." It could not with any degree of plausibility be said that these provisions of the statute are not sufficiently broad to authorize the tax-collectors to collect such

taxes as are provided for by the act of 1908. By section 951 of the code the tax-collectors are required to report to the grand jury all special taxes collected by them, and the judge of the court is required to call to the attention of the grand jury at each term this duty on the part of the tax-collector. By the act of 1896 (Acts 1896, p. 35) it is made the duty of the tax-collectors to make monthly statements, under oath, of the taxes collected by them, and to make monthly payments thereof. The tax-collectors are under bond for the faithful discharge of their duties pertaining to the collection of taxes and the proper disposition thereof, and are allowed fees for the service. The ordinaries are not under bond for such purpose, and there is no provision for their compensation, though the service may be onerous and the responsibility great. The act is a revenue act adopted primarily for the purpose of providing funds for the reorganization and support of the penitentiary system of the State. The legislature necessarily contemplated that large sums of money would come to the State from that source. Such was the object of the legislation. The fees provided for ranged from $200 to $500 for each license granted. It is not likely that the legislature would have authorized the collection of taxes to such large amount without making provisions for suitable safeguards with respect to their collection and disposition. Looking to the welfare of the State, and inasmuch as nothing was said in the act concerning whose duty it should be to collect the funds in contemplation, and bearing in mind the existing general law providing for the collection of such taxes by bonded tax-collectors, it is reasonable to infer that the legislature intended that the duty of collection should devolve upon the tax-collectors through the usual channels, rather than upon unbonded ordinaries, for whom no compensation was provided under the act. If it should have entered the legislative mind to make such change in the existing law as to take from the tax-collectors the power to collect, and confer it upon the ordinaries, such intent would not have been left to mere inference, but would have been expressed in appropriate terms, and some requirement for bond for the State's security and provision for compensation to the ordinaries would have been made. Ordinarily statutes are not amendable by mere implication. Such would be the effect upon the statutes above enumerated, with ref-

erence to the duty of collection of special taxes by tax-collectors, if the act of 1908 is to be construed as contended for by the majority. It seems clear that there was no legislative intent that the duty of collecting these taxes should devolve upon the ordinaries, and it requires strained and unauthorized construction to hold that the act by implication conferred power upon the ordinaries to collect. Without such power, under no view was there power vested in the ordinaries to issue execution against delinquent taxpayers, and the judge should have granted the injunction prayed for.