## TALMADGE *v.* SUTTON.

No. 9112. OCTOBER 13, 1932.

*W. S. Mann* and *Harry S. Strozier*, for plaintiff in error.

*Paul L. Lindsay, Roy C. Leathers, Branch & Howard, W. J. Crowe*, and *R. S. Foy*, contra.

BELL, J. J. M. Sutton, State Veterinarian, brought a suit against Eugene Talmadge, Commissioner of Agriculture, seeking to enjoin the defendant from interfering with the plaintiff in the performance of his duties as State Veterinarian. The defendant demurred generally and specially to the petition, and filed an answer. Owing to the disqualification of the judge of the superior court of the county in which the suit was filed, jurisdiction was assumed by Judge Jones of the Macon judicial circuit, who overruled all grounds of the demurrer, and, after hearing evidence, granted an interlocutory injunction, and the defendant excepted.

The petition contained the following allegations: The plaintiff as State Veterinarian has certain specific duties to perform, and by the law creating this office and the statutes amendatory thereof he is given complete jurisdiction over the administration of the duties of the office of State Veterinarian, "having the sole right to employ assistants, both field assistants and office assistants, and to fix their compensation and to supervise their work." In order to carry on his duties as State Veterinarian, it is necessary for the plaintiff to have various assistants and inspectors. The plaintiff has heretofore designated C. C. Von Gremp as dairy inspector and field veterinarian at a salary of $225 per month, and C. R. Smith as dairy inspector at a salary of $150 per month, and Miss Edda

McEachin as secretary to the State Veterinarian at a salary of $175 per month. Each of these employees is efficient and experienced, and almost, if not entirely, indispensable to the plaintiff in the performance of his official duties, and any interference with these employees or either of them is a serious interference with the proper functioning of the plaintiff as State Veterinarian. Notwithstanding the plaintiff has the sole right to employ and discharge all employees in his department, the defendant has discharged each of the several employees just referred to, and has refused to sign vouchers for their compensation. The work of each of these employees is entirely satisfactory to the plaintiff, and there are ample funds with which to pay such employees, the same having been specifically provided and allocated for that purpose by the General Assembly. The defendant is wilfully refusing to sign vouchers for the salaries of these employees, and "has refused to sign any and all vouchers for the payment of the expenses incident to salaries, and the upkeep and carrying on of the work of the State Veterinary Department, thus practically nullifying the work of the entire department." The defendant has threatened to discharge the plaintiff as State Veterinarian, and has demanded his resignation. The defendant is preparing to and will attempt to take over the administration of the State Veterinarian's office and all of its duties, notwithstanding the fact that the defendant has no authority to do so. These acts are wilful and done with the intent and purpose of hindering the plaintiff in his official work as State Veterinarian. "Defendant is withholding your petitioner's mail by having said mail delivered to his office first and then refusing to turn said mail over to your petitioner, and is diverting said mail or part of said mail as he desires, and this is unlawful and is hindering your petitioner in the discharge of his duty, and said defendant is undertaking to give orders with regard to the administration of the duties of the State Veterinary's office, is planning to discharge any and all of said employees now in said department, and to completely take over the work of the State Veterinarian, in violation of law and in violation of your petitioner's rights. In furtherance of this design and purpose on the part of the defendant, he has introduced various employees of the plaintiff to Dr. M. E. White, and informed "said employees that the said M. E. White was the new State Veterinarian and in charge of the State Vet-

erinarian's work," and that such employees would thereafter report directly to the defendant. On one occasion the defendant sent his office assistant with two other persons to take physical charge of the plaintiff's offices and lock them up, and "then and 'there demanded the keys to said offices. All of said acts were in furtherance of defendant's attempt to interfere with and take over the duties of plaintiff as State Veterinarian." Before presenting this petition the plaintiff appeared before the Governor "under the provisions of the act of 1931 known as the reorganization bill," but the Governor held that "he had no jurisdiction in the premises."

The prayers were that the defendant be restrained from interfering with the plaintiff as set forth in the petition, and from interfering with his assistants and employees in any manner; that he be restrained from employing or seeking to employ any person to work "in said State Veterinary's office or department," and from expending or attempting to expend any of the funds appropriated and allocated for the carrying on of the State Veterinary department in this State; and that the defendant also be restrained from receiving or diverting the plaintiff's mail.

The commissioner admitted that he at one time thought he had the right to remove the veterinarian from office, but testified that he later abandoned this idea. He denied that he had ever introduced any other person as the plaintiff's successor, and contended that in all matters he had acted in good faith and in the proper exercise of the duties of his office.

The trial judge delivered an opinion in support of his conclusion that the defendant should be enjoined; and it appears that he decided the case altogether upon the theory that the Commissioner of Agriculture now has no supervision or control over the State Veterinarian, and therefore that there could be no exercise of discretion by the commissioner in respect of the acts complained of. The restraining order was to the effect that the defendant be enjoined from interfering in any manner with the plaintiff "in the discharge of his duties as State Veterinarian, or with his employees, agents or assistants," and that he likewise be enjoined "from receiving any of the plaintiff's mail or any mail intended for the office of State Veterinarian."

We are of the opinion, that the petition, when considered on

general demurrer, stated sufficient cause for injunctive relief, and that the judge did not err in overruling the general demurrer. As to several of the acts complained of, the petition alleges in effect that the commissioner acted wilfully and arbitrarily, and thus entirely without the bounds of discretion. Upon such a state of facts an injunction could be granted, regardless of whether the plaintiff had the right to conduct the office of State Veterinarian independently of any supervision by the defendant as Commissioner of Agriculture. *Jackson* v. *State Highway Dept.*, 164 *Ga.* 434 (4) (138 S. E. 847); *Van Valkenburg* v. *Stone*, 172 *Ga.* 642 (158 S. E. 419). If the petition is good for any part of the relief prayed for, it is not subject to general demurrer. *Arteaga* v. *Arteaga*, 169 *Ga.* 595 (4) (151 S. E. 5).

We will not pass upon the special grounds of demurrer. In the brief of counsel for the plaintiff in error it was stated that some of the objections raised by the special demurrer may have been met by the amendments to the petition, although for the most part the defects pointed out by the demurrer still existed. It was further stated that the special demurrer was in aid of the general demurrer, and for that reason would not be specifically discussed, although insisted on. Since counsel have thus admitted that some of the grounds of demurrer may have been without merit after the petition was amended, and there is no effort to point out which of the grounds are still relied on, this court will not examine the special demurrers for the purpose of determining which of them are valid and which not.

■ Although we hold that the petition was not subject to general demurrer, and the judgment to that extent will be affirmed, we entertain a different opinion as to the grant of the interlocutory injunction. We can not agree that the office of State Veterinarian is such a distinct and independent governmental agency that it may be conducted by the incumbent to the absolute exclusion of all supervision or control by the Commissioner of Agriculture, as was held by the judge. It affirmatively appears that the judge did not plant his order upon any finding which he might have been authorized to make upon conflicting testimony, but that he was controlled entirely by the legal opinion to which we have referred. Upon some other view of the law he might have rendered a different judgment upon a consideration of the evidence, and therefore it is neces-

sary to make some adjudication as respects the authority of these two officers. It is impossible to indulge in any intelligible discussion of the question at issue without reviewing at some length the various statutes pertaining to the offices held respectively by the contending parties.

The Department of Agriculture was created by an act of the General Assembly passed in 1874, wherein it was declared that "said department shall be under the control and management of one officer, who shall be known as the Commissioner of Agriculture." Ga. L. 1874, p. 5. The quoted provision is now contained in the Civil Code of 1910, § 2066. Among other duties prescribed by the act of 1874, the commissioner was required to report "upon any matter of interest in connection with the dairy," and upon the "utility and profits of sheep raising." Thus from the beginning he was charged with some duty with respect to matters which might now pertain to the office of State Veterinarian, the latter office not having been created until the year 1910, as will be shown below.

In 1899, the legislature placed upon the Commissioner of Agriculture the duty of ascertaining in what sections of the State cattle were free from certain contagious diseases, and he was empowered and required to establish and maintain such quarantine lines as would protect any section of the State found to be free from such diseases, "and to make and enforce such rules and regulations as may be necessary for the protection of such cattle." Ga. L. 1899, p. 97; Civil Code (1910), § 2071. By an act approved August 22, 1905, the commissioner was authorized, upon certain conditions, to employ a veterinary surgeon in any county in this State to treat and to prevent the spread of diseases affecting the live stock in such county. Ga. L. 1905, p. 121; Civil Code (1910), § 2069. By a statute enacted in 1909 he was given "full power to make or enact such rules and regulations as he may deem necessary for governing the movement, transportation, or disposition of live stock that may be quarantined on account of being infected or affected with a contagious or communicable disease." Although the office of State Veterinarian had not at this time been expressly created, the act of 1909 provided "that the State Veterinarian or any duly authorized live-stock inspector, acting under the authority of the Commissioner of Agriculture," was authorized and required to perform certain

specified acts of quarantine. Under other provisions of the same act, live stock which were subject to the quarantine could be removed only upon conditions "prescribed by the rules and regulations of the Commissioner of Agriculture," and disinfection was required to be done by the owners "within a reasonable time after receiving a written or printed notice from the Commissioner of Agriculture, as State Veterinarian." It is clearly apparent that the legislature by the act here referred to intended to make of the Commissioner of Agriculture a State Veterinarian ex officio, and that by the use of that term the commissioner himself was the official contemplated. Ga. L. 1909, p. 131, Civil Code (1910), §§ 2073-2082.

In the year 1910 the legislature expressly created "the office of State Veterinarian in the Georgia State Department of Agriculture," to be filled by appointment by the Commissioner of Agriculture, upon the endorsement of the Georgia State Board of Veterinary Examiners, "such officer to continue in office during good behavior and the proper performance of his duties." The duties of the State Veterinarian were to investigate and take proper measures for the control and suppression of all contagious and infectious diseases among the domestic animals within the State, "under such rules and regulations as may be promulgated by him and approved by the Commissioner of Agriculture of Georgia." It was further declared that he should "assume charge of the work of cattle-tick eradication," and devote his whole time to the improvement of the live stock industry; and that he "shall make report upon his work annually, the same to be published in the annual report of the Commissioner of Agriculture." The salary was fixed at $2500, and he was to be reimbursed for his actual traveling expenses incurred in the regular discharge of his duties. Ga. L. 1910, p. 125.

By an act approved August 19, 1911, the legislature provided that the State College of Agriculture at Athens should, in connection with its veterinary department, establish a plant for the production of hog cholera serum, and that the distribution of the serum, in case of outbreaks of hog cholera, should be made "under the direction of the State Veterinarian," or "under the direct supervision of that officer." Ga. L. 1911, p. 41. This act contained no reference to the Commissioner of Agriculture. The provisions as to the authority of the State Veterinarian were

repeated in several later acts. Ga. L. 1912, p. 25; Ga. L. 1914, p. 21.

By an act approved August 18, 1919, the State Veterinarian was required, upon request of the proper county authorities, to send into any county an expert to instruct and train as many as four persons in the proper and efficient use of hog cholera serum and virus, and to issue to the persons so trained and qualified permits to administer such serum and virus. In this statute no reference was made to the Commissioner of Agriculture. Ga. L. 1919, p. 32.

By an act passed in 1912 the sum of $15,000 was appropriated for the purpose of exterminating the cattle-tick and developing the live-stock industry. The act provided "that this work shall be under the supervision and control of the State Veterinarian, who is hereby authorized, under the rules and regulations now in force issued under date of November 9, 1910, and approved by the Commissioner of Agriculture, to employ and discharge men qualified to act as cattle inspectors, or supervising veterinarians, and a clerk for keeping the records of this work." It was further enacted that the State Veterinarian should annually "file with the Commissioner of Agriculture a detailed statement of the expenditure and progress of this work, same to be published in pamphlet form for free distribution among the people." It is noted that the act does not purport to confer absolute authority upon the State Veterinarian, but the work in question is to be conducted under certain rules and regulations previously adopted by the Commissioner of Agriculture and referred to in the statute. Ga. L. 1912, p. 22. By an act approved August 17, 1918, the State Veterinarian was invested with additional powers and duties with reference to the eradication of the cattle-tick, but it was provided that "nothing contained in this act shall be construed as affecting any rule or regulation heretofore or hereafter passed by the Department of Agriculture governing tick eradication." Ga. L. 1918, p. 256. In 1924, the legislature provided that the State Veterinarian should establish and maintain a cattle-tick quarantine along the border between the States of Georgia, Florida, and Alabama, "by the use of patrols or in such other manner as in his judgment will most effectively prevent reinfestation of the tick-free area in the State of Georgia," and that subsequent reinfestation of tick-free area should be eradicated by the State Veterinarian at the expense of the State, without

expense to the county. The veterinarian was required to nego-
tiate with the county authorities and the property owners with re-
gard to the construction of suitable fencing on the State lines, and
to report to the next session of the General Assembly his acts, find-
ings, and recommendations. For the purpose of executing the fore-
going, a specified sum of money was "appropriated to the State
Veterinarian, Department of Agriculture." Ga. L. 1924, p. 78.

On August 20, 1927, the legislature passed an act to require the
State Veterinarian to eradicate tuberculosis in domestic animals,
and for other purposes. The act contained the following provi-
sions: "The State Veterinarian shall have full and complete author-
ity and responsibility in all live-stock sanitary control work. The
State Veterinarian, or his duly authorized agent, is hereby em-
powered to enter upon any premises, barn, lot, or any other place
where cattle are kept, for the purpose of applying test with tuber-
culin to ascertain whether or not the animals so tested are affected
with tuberculosis. The owners or keepers of such cattle shall render
such reasonable assistance as may be required to enable the State
Veterinarian or his agent to apply the test with accuracy and dis-
patch." The sum of· $12,500, or so much thereof as might be
necessary, was appropriated for the purpose of executing the provi-
sions of this act. The act contained no reference to the Commis-
sioner of Agriculture. Ga. L. 1927, p. 348.

The statement that the veterinarian should have full and complete
authority and responsibility in all live-stock sanitary control work
did not necessarily mean that he should have absolute authority to
the exclusion of the commissioner. The act did not purport to
contrast the authority of these two officers, but the apparent inten-
tion of the legislature was to fix a duty and responsibility upon the
veterinarian and to clothe him with such power as would enable him
"to enter upon any premises, barn, lot, or any other place where
cattle are kept," and otherwise to proceed as the effective agency of
the law in his contacts and relations with the public. In view of
all the legislation upon this subject, it would seem that the language
of other statutes purporting to confer full and complete authority
upon the veterinarian to perform particular acts should be construed
in like manner,—not as setting up a power to be compared with
that of the commissioner, but as charging the veterinarian with the
performance of certain duties, and as expressly equipping him with
all necessary and proper credentials for that purpose.

In 1914 provision was made for the inspection and supervision of slaughter-houses, meat-markets, dairies, and the products of each. Ga. L. 1914, p. 148. In section 1 of this act it was provided that "the State Veterinarian of the Department of Agriculture shall assume supervision and control over the sanitary conditions of all slaughter-houses, meat and meat food products, dairies, milk depots, milk and its by-products, in the State of Georgia, under the provisions of this act, and such rules and regulations as shall be promulgated by him and approved by the Commissioner of Agriculture;" also that it should be the duty of the veterinarian "to employ competent assistants of unimpeachable character, reputation for integrity, and fitness for service to carry into effect the provisions of this act. The State Veterinarian shall annually render a detailed report to the Commissioner of Agriculture of conditions found upon inspection, and he shall issue a statistical bulletin showing the conditions of the dairies and meat markets as far as they relate to the production of home supplies; such report may be published jointly with the report of the State pure food inspector and shall be published for free public distribution." Many other duties were enjoined upon the veterinarian by the provisions of the act of 1914, but it should be remembered that all of these duties were to be performed "under the provisions of this act, and such rules and regulations as shall be promulgated by him and approved by the Commissioner of Agriculture," as stated in section 1.

The act of 1914 was amended in 1929. Certain duties in relation to the inspection, testing, and condemning of dairy food products were placed upon the veterinarian. Ga. L. 1929, p. 280. It was even provided that each individual manufacturing dairy products should make quarterly reports to that officer, and (section 12, p. 288) that it should be unlawful for any person to operate any "milk plant or plants built to manufacture butter, ice-cream, cheese, condensed milk, or milk powder in the State of Georgia without first having applied for and obtained a license, signed by the State Veterinarian, bearing the seal of his office." The act of 1929, however, was expressly enacted as an amendment to the act of 1914, and did not repeal the previous enactment that all provisions of the act should be executed by the State Veterinarian under rules and regulations approved by the Commissioner of Agriculture. In this connection it is interesting to compare the provisions of the act of

March 5, 1931. Ga. L. Extraordinary Session 1931, p. 61. In section 1 of that act it was provided that all persons manufacturing, dealing in, and distributing milk made from milk powder should secure a permit from the Commissioner of Agriculture before selling, offering for sale, or distributing such milk in this State. Other regulations for such business were prescribed by the act, and in section 3 it was declared that "the Commissioner of Agriculture shall enforce this act through the inspectors of the Veterinary Bureau, and shall not employ additional help in such bureau for such purpose."

It is rather strange that persons engaged in the manufacture of condensed milk or milk powder should be required to obtain a license from the State Veterinarian, as provided in the act of 1929, and that persons engaged in the manufacture, sale, or distribution of milk made from milk powder should secure a license from the Commissioner of Agriculture, unless the functions of the two offices should be correlated and reconciled in the enforcement of these kindred, if not identical, occupations. The act of 1931 also contains a strong implication that the office of State Veterinarian is still to be treated as a part of the Department of Agriculture, and also that inspectors employed by the veterinarian are in law employees of such department.

By the reorganization act of 1931 the term of the State Veterinarian was fixed at four years. The change as to tenure was made in a subdivision headed "Commissioner of Agriculture." Ga. L. 1931, p. 40.

In all of the general appropriation acts which have been passed since the creation of the office of State Veterinarian, amounts have been appropriated for the use of the veterinarian, but the appropriations have been made, not to that officer, but to the Commissioner or Department of Agriculture. Ga. L. 1911, p. 21; Ga. L. 1918, pp. 12, 13; Ga. L. 1919, p. 14; Ga. L. 1921, p. 15; Ga. L. 1923, p. 22; Ga. L. 1925, p. 21; Ga. L. 1929, pp. 11-13; Ga. L. 1931, p. 53. In the act of 1918, supra, it was provided that "the Commissioner of Agriculture shall annually furnish to the General Assembly a detailed itemized statement of the expenditure of the funds appropriated . . for the extermination of cattle-tick and developing the live-stock industry, and for the sale and distribution of hog-cholera serum, and for the investigation and control of the

infected districts." Several of the acts provided for the payment of the actual traveling expenses of the State Veterinarian, "statement of said expenses to be audited by the Commissioner of Agriculture." By the act of 1931 the sum of $300,000 was appropriated to the Department of Agriculture, but $75,000 of this amount was "allocated to the State Veterinarian" for the execution of the duties incident to his office. By a further provision of the same act the sum of $4000 was appropriated to the Department of Agriculture for the purpose of eradicating tuberculosis in domestic animals, and in this provision no reference whatever was made to the State Veterinarian.

The budget law enacted at the extraordinary session of 1931 provided that the director of the budget should require from the proper State officials, including all executive and administrative officers and "agencies expending or supervising the expending" of State moneys, such estimates and other information as such director might desire. This act further provided that before an appropriation to any "spending agency" should become available, "such agency shall submit" to the Governor once in every quarter a requisition for an allotment estimated as necessary "to carry on the work of the agency during the ensuing quarter." Ga. L. Ex. Sess. 1931, p. 94. By the reorganization act it was provided that the entire funds available for the support and maintenance of the Department of Agriculture shall be the amount set forth in the appropriation bill from time to time, and that all funds "collected by said department or any subdivision thereof shall be paid into the treasury of the State and disbursed by appropriations duly provided by the General Assembly and approved by the Governor."

It appears from the evidence in this case that the quarterly requisitions contemplated by the budget act were prepared and submitted, not by the State Veterinarian, but by the Commissioner of Agriculture; and from a study of the budget and the reorganization acts, together with the general appropriation act adopted in the same year, there is a plain inference that the commissioner should be considered as the head of the department, to which even the "allocated" funds were appropriated, and also that such department should be considered as the "spending agency." "This court, and all other courts, will recognize the practice of co-ordinate departments of government, and allow the construction placed by

the officers in such departments upon statutes, and even the constitution, to be operative where there is room for construction." *Temple Baptist Church* v. *Terminal Co.,* 128 *Ga.* 669, 680 (58 S. E. 157); *Carroll* v. *Wright,* 131 *Ga.* 728 (4), 736 (63 S. E. 260); *Griner* v. *Baggs,* 4 *Ga. App.* 232 (3) (61 S. E. 147). It seems to have been the well-established practice that the commissioner himself should execute checks and vouchers for the payment of the salaries and other expenses incurred in each division of his department, including the office of State Veterinarian. We think he is more than a mere subtreasurer or disbursing agent for the other officials assigned to different duties in his department. The commissioner himself is under bond, while the State Veterinarian is not (Ga. L. 1927, p. 206); and it does seem that he should be charged with some responsibility in fixing the salaries to be paid to employees and also in determining the quality of the service to be rendered. Certain statutes require that reports shall be made to the commissioner, and that he shall in turn make report to the General Assembly; also that he should distribute pamphlets among the people on certain work as conducted by the veterinarian. It would be hardly reasonable to say that he should be considered as conducting a mere bureau for the receipt and distribution of such information.

In reviewing the several statutes referred to above, we do not imply that some of the stated provisions may not have been amended or superseded by later enactments. Our purpose has been simply to consider the whole trend of the legislative policy as respects the two offices in question; and from an examination of these statutes we must conclude that the office of the State Veterinarian is still an office within the Department of Agriculture, and that this department continues, to some extent at least, to be subject to the "control and management of one officer," who is the Commissioner of Agriculture.

Where the legislature has directed that certain specific acts should be performed by the veterinarian, it would be illegal for the commissioner to intervene for the purpose of preventing effective action by the veterinarian. In some cases the commissioner may have only a sort of veto power over the acts of the other officer. In others his authority may perhaps be greater. In assigning certain duties and responsibilities to the veterinarian, it was only

natural that the law should leave something within the realm of discretion. We refer here to such matters as selecting the employees and other subordinates, determining the salaries and other expenses to be incurred, and deciding upon the methods and details to be employed in executing the work. Certainly the Commissioner of Agriculture is not entirely excluded from this realm. He is clothed with at least some discretion to the end that his department, in this as well as in other divisions, shall be operated upon an efficient and economical basis. He of course could exercise no discretion which would tend to subvert the will of the legislature, as by preventing or hindering the execution of the duties specifically required of some other officer; but such supervision and control as he may still exercise should be exerted to promote the proper execution of the laws, and not to impede or obstruct those officials who are designated as the particular instrumentalities for the enforcement of such laws. According to the evidence of the commissioner, he merely sought to dispense with the services of two inspectors and to reduce the salary of the secretary to the veterinarian. He contended that he was acting in good faith, and that he and the veterinarian were at one time agreed upon the course now sought to be maintained by him with respect to these employees. He claimed that his purpose in having the mail of the veterinarian diverted to his office was to make some check upon the work of inspectors, and to conduct investigation as to prices being charged for serum by field veterinarians. The plaintiff introduced evidence, both direct and circumstantial, for the purpose of refuting these contentions on the part of the defendant, and it is rather difficult to appreciate the necessity of causing even the official mail of the veterinarian to be diverted as indicated, unless there was some question as to the motives or good faith of the veterinarian, concerning which the defendant has made no contention.

The point is, however, that the case was decided in the court below upon a theory of law which necessarily excluded from consideration practically all of the evidence of the commissioner, and resulted in the enjoining of at least some of the acts of the defendant, regardless of any weight which the judge, if he saw fit, might have given to the defendant's testimony under a different view of the law. Beyond the general observations expressed above, we do not deem it necessary to define the specific duties of these two officers

as related to each other, or to delineate the extent and sphere of the supervision which may be exercised by the commissioner over the conduct of the veterinarian. Suffice it to say that the commissioner is not without any discretionary supervision over the action of the veterinarian, as was contended by the veterinarian and as was held by the trial judge. In thus speaking in general terms only, we do not withhold any ruling to which either party is entitled in the circumstances. The judge made no ruling as to whether the commissioner has a discretion in respect of any particular matter, except to hold that he has absolutely no control over the office of the veterinarian. The brief filed for the defendant in error contains the following statement: "Counsel for the defendant in error do not feel that it is incumbent upon the defendant in error at this time and in this case to define just what the powers, duties, and discretions of the Commissioner of Agriculture may be. It is sufficient to say that the specific acts complained of by the State Veterinarian and charged to the Commissioner of Agriculture were in each instance beyond the authority of the Commissioner of Agriculture and in violation of the specific provisions of law as enacted by the General Assembly." In the brief filed for the plaintiff in error is the statement that in its last analysis the question is whether the veterinarian is "subject to any supervision and control by the commissioner," and practically the entire argument is then devoted to this general question. This court should hardly enter upon a decision of specific questions as to which no rulings were made by the trial judge, and upon which no arguments have been submitted in this court by either side.

■ In conclusion, we hold that an interlocutory injunction should not have been granted upon the theory that the office of State Veterinarian is subject to no supervision or control by the Commissioner of Agriculture; but that the right to the injunction should have been determined upon the question of whether the commissioner was acting capriciously or arbitrarily or was otherwise guilty of an abuse of discretion in relation to the particular matters complained of in the petition.

*Judgment reversed. All the Justices concur, except Atkinson, J., absent.*