301 Ga. 354
FINAL COPY

S17A0430.  GEORGIA MOTOR TRUCKING ASSOCIATION et al. v. GEORGIA DEPARTMENT OF REVENUE et al.

PETERSON, Justice.

In this appeal, we consider the meaning of the phrase "motor fuel taxes" as it is used in a provision of the Georgia Constitution providing that "[a]n amount equal to all money derived from motor fuel taxes received by the state . . . is hereby appropriated . . . for all activities incident to providing and maintaining an adequate system of public roads and bridges in this state[.]" See Ga. Const. of 1983, Art. III, Sec. IX Par. VI (b) (the "Motor Fuel Provision"). Here, a trucking industry association and three individual motor carriers challenge local sales and use taxes on motor fuels, the revenues of which are not used solely for public roads and bridges. They argue that these taxes fall within the meaning of "motor fuel taxes" under the Motor Fuel Provision and, therefore, the revenues from these taxes (or an amount equal to that revenue) must be allocated to the maintenance and construction of public roads and bridges. We affirm the dismissal of the plaintiffs' complaint because the history

and context of the Motor Fuel Provision reveals that "motor fuel taxes" are limited to per-gallon taxes on distributors of motor fuel, and do not include sales and use taxes imposed on retail sales of motor fuels.

1. *Background*

During its 2015 Session, the Georgia General Assembly enacted the Transportation Funding Act of 2015, which amended a variety of provisions related to the funding of transportation infrastructure (including taxes that relate to motor fuel in various ways). See Ga. L. 2015, pp. 236, 241-264, §§ 5-8 ("HB 170").

Following the passage of HB 170, the Georgia Motor Trucking Association, J&M Tank Lines, Inc., F&W Transportation, and Prolan Logistics, LLC ("Plaintiffs")[1] filed suit against the Georgia Department of Revenue, Lynnette T. Riley in her official capacity as the State Revenue Commissioner, and Steve McCoy in his official capacity as the State Treasurer (collectively

---

[1] As part of their complaint, Plaintiffs also sought a class certification for a class consisting of "Georgia domiciled motor carriers who purchase motor fuel in the state of Georgia."

"Defendants").[2] Plaintiffs alleged that HB 170 impermissibly allowed the revenue from local sales and use taxes on the retail sale of motor fuel to be used for purposes other than for building and maintaining public roads. Plaintiffs sought mandamus relief to compel Defendants to use the revenue from these sales and use taxes exclusively for the maintenance and construction of roads and bridge projects (or establish a mechanism to ensure that an amount equal to such funds is so used). Plaintiffs also sought (1) mandamus and extraordinary interlocutory relief to compel Defendants to deposit these revenues into an escrow account pending the litigation, (2) a declaration that HB 170 is unconstitutional, and (3) attorneys' fees.

The trial court granted Defendants' motion to dismiss, concluding that Plaintiffs' mandamus claims failed because Plaintiffs had an adequate legal remedy to challenge illegally or unconstitutionally assessed and collected taxes under a refund statute, and neither the Commissioner nor the Treasurer had a clear legal duty to monitor or control local spending for roads and bridges or could appropriate state funds to offset local spending of local motor fuel tax

---

[2] Although the trial court denied as moot Plaintiffs' motion to add McCoy as a party defendant, it nevertheless addressed the claims against him.

revenues. The trial court ruled that mandamus was unavailable because the court would have to oversee and control Defendants' general course of conduct if it granted relief (which is not available in mandamus). The court concluded that the remaining claims were barred by sovereign immunity. The court also concluded in the alternative that, if Plaintiffs' claims were not barred, they nevertheless failed on the merits because HB 170 did not violate the constitutional provision at issue; the challenged sales taxes were not "motor fuel taxes" within the meaning of the Constitution. Plaintiffs then filed this appeal.

2. *Analysis*

The parties raise a number of issues about jurisdiction, procedure, and the merits, but one issue disposes of the whole case. Plaintiffs' mandamus claims are not barred by sovereign immunity. And those claims — like all of Plaintiffs' other claims — fail if local sales and use taxes imposed on the retail sale of motor fuel are not "motor fuel taxes" as that term is used in the Motor Fuel Provision. We conclude that they are not, and thus the trial court properly dismissed Plaintiffs' complaint in its entirety.

4

The general rule in Georgia is that "the appropriation for each department, officer, bureau, board, commission, agency, or institution for which appropriation is made shall be for a specific sum of money; and no appropriation shall allocate to any object the proceeds of any particular tax or fund or a part or percentage thereof." Ga. Const. of 1983, Art. III, Sec. IX, Par. VI (a). But there are exceptions to this general prohibition against earmarking particular revenues for specific purposes, and each exception is laid out in the same paragraph of the Constitution. See Ga. Const. of 1983, Art. III, Sec. IX, Par. VI (b)-(o). The first of these exceptions is at issue here, and reads in relevant part:

> An amount equal to all money derived from motor fuel taxes received by the state in each of the immediately preceding fiscal years . . . is hereby appropriated for the fiscal year beginning July 1, of each year following, for all activities incident to providing and maintaining an adequate system of public roads and bridges in this state . . . .

Ga. Const. of 1983, Art. III, Sec. IX, Par. VI (b). The question we must answer today is whether certain local sales and use taxes on the retail sale of motor fuel are included within the "motor fuel taxes" that this Motor Fuel Provision automatically appropriates for roads and bridges.

5

We generally apply the ordinary signification to words in construing a constitutional provision. See Blum v. Schrader, 281 Ga. 238, 239 (1) (637 SE2d 396) (2006). This means we afford the constitutional text its plain and ordinary meaning, view the text in the context in which it appears, and read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would." Deal v. Coleman, 294 Ga. 170, 172-173 (751 SE2d 337) (2013) (citation omitted). "[W]here a word has a technical as well as a popular meaning, the courts will generally accord to it its popular signification, unless the nature of the subject indicates, or the context suggests, that [the word] is used in a technical sense." Clarke v. Johnson, 199 Ga. 163, 164 (33 SE2d 425) (1945); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69-77 (2012) (words are to be understood in their ordinary, everyday meanings unless the context shows that they have a technical meaning).

In understanding a constitutional provision, we must be mindful that "[c]onstitutions are the result of popular will, and their words are to be understood ordinarily in the sense they convey to the popular mind." Clarke, 199 Ga. at 164. Accordingly, we must construe a constitutional provision

6

consistent with the meaning of its text at the time it was adopted. Collins v. Mills, 198 Ga. 18, 22 (1) (30 SE2d 866) (1944); see also Smith v. Baptiste, 287 Ga. 23, 32 (2) (694 SE2d 83) (2010) (Nahmias, J., concurring) ("Our task in interpreting the Constitution is to determine the meaning of the language used in that document to the people who adopted it as the controlling law for our State.").

> A constitutional provision must be presumed to have been framed and adopted in the light and understanding of prior and existing laws and with reference to them. Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adoption.

Clarke, 199 Ga. at 166 (citation and punctuation omitted). In other words, the constitutional provision at issue here means now what it meant at the time it was enacted. Collins, 198 Ga. at 22 (1). To discern the meaning of "motor fuel taxes" at the time the term entered the Constitution, we must consider the history of taxes on motor fuels and the context that history provided at the time the relevant constitutional provision was adopted.

A.    *Statutory and constitutional history of taxes on motor fuels*

(i)    *Taxes on distributors of motor fuels*

In 1927, the Georgia General Assembly passed an act authorizing state taxes on motor fuels. See Ga. L. 1927, pp. 104, 105-106, §§ 1 and 2. The 1927 Act provided that

> each distributor of fuels who engages in such business in this State shall pay an occupation tax of four cents per gallon, for each and every gallon of such fuels (1) imported and sold within this State, or (2) imported and withdrawn for use within this State, or (3) manufactured, refined, produced, or compounded within this State and sold for use or consumption within this State, or used and consumed within this State by the manufacturer, refiner, producer, or compounder. . . . That the proceeds derived from said tax shall be distributed as follows: Two and one half (2½) cents per gallon to the State-aid fund for use in construction on the State-aid system of roads, and one (1) cent per gallon to the several counties of this State, as now provided by law. The 1/2 cent of said gas tax not allocated under the terms of this bill is hereby set aside to the public schools of said State for an equalization school fund.[3]

--------

[3] The term "distributor" was defined as

> any person, association of persons, firm, corporation, and political subdivision of this State, (a) That imports or causes to be imported, and sells at wholesale or retail or otherwise within this State, any of the fuels or kerosene as specified above; or (b) That imports or causes to be imported, and withdraws for use within this State by himself or others, any of such fuels or kerosene from the tank-car or other original container or package in which imported into this State; or (c) That manufacturers, refines, produces, or compounds any of such fuels or kerosene within this State, and sells the same at wholesale or retail or otherwise within this State for use or consumption within this State.

See Ga. L. 1927, p. 105, §1. The legislature specifically excluded from the definition of "distributor" "any retail dealer in such fuels or kerosene, or operator or proprietor of a gasoline filing-station or public garage or other place at which such fuels are sold, where such dealer or other person procures his entire supply thereof from a 'distributor' as above defined." Id.

The 1927 Act thus began the process of earmarking a portion of revenues from taxes on motor fuel distributors for the purpose of the State's roads and bridges.

In 1929, the tax on motor fuel distributors was amended to increase the tax by an additional two cents per gallon, and to strike the words "two and one half cents per gallon to the State-aid fund for use in construction on the State-aid system of roads" and replacing it with "four cents per gallon shall be set aside to the State-highway fund or State-aid fund for use in construction on the State-highway system of roads or State-aid system of roads." See Ga. L. 1929, pp. 99, 101, § 2. The short title of the 1929 Act was "Motor-Fuels; Taxation and Allocation."

In 1937, the General Assembly revised the statutes related to the taxation of distributors of motor fuels, and statutorily defined these statutes as the "Motor-Fuel Tax Law." See Ga. L. 1937, pp. 167, 169, § 1 (amending existing chapter on motor fuels by striking it and "inserting in lieu thereof a new Chapter 92-14 to be known as the 'Motor-Fuel Tax Law'"). This appears to be the first use of the phrase "Motor-Fuel Tax" (hyphenated or otherwise) in Georgia law. When first enacted, the Motor-Fuel Tax Law contained a provision that imposed an excise tax "on all distributors of motor fuel . . . upon the sale or use of motor

9

fuel by them within this State, at the rate of six ($0.06) cents per gallon." Id., p. 174, § 1 (codified as Code Ann. § 92-1403 of the 1933 Georgia Code). Like the 1927 and 1929 Acts preceding it, the 1937 Act also mandated that the funds collected from the taxes on distributors of motor fuels be disbursed to (1) the "State Highway Fund, for use in construction on the State Highway System of Roads, or State Aid System of Roads[,]" (2) counties to be used exclusively for the construction and maintenance of public roads, and (3) the State's equalization fund for public schools. Id., p. 180, § 1. Unlike the 1927 and 1929 Acts, the 1937 Act removed this mandate from the tax levy provision and set it out in a separate statute. Id. (codified as Code Ann. § 92-1404). In 1979, the General Assembly imposed an additional tax on distributors, and designated this additional tax the "second motor fuel tax" (hereinafter, the "Second Motor Fuel Tax"). Ga. L. 1979, pp. 1274, 1275-1277, §§ 2, 4, 6, 8.

The two taxes on motor fuels levied on distributors remained as part of the Motor Fuel Tax Law until the 2015 passage of HB 170. Prior to the passage of HB 170, the Motor Fuel Tax Law, now found at OCGA § 48-9-1 et seq., contained the "first" tax on distributors of motor fuels that provided an "excise tax . . . imposed at the rate of 7 1/2 [cents] per gallon on distributors who sell

10

or use motor fuel within this state." OCGA § 48-9-3 (a) (1) (2014) (hereinafter, the "First Motor Fuel Tax"). The Second Motor Fuel Tax was also part of the the Motor Fuel Tax Law prior to enactment of HB 170, and imposed an additional tax on distributors at a "rate of 3 percent of the retail sale price less the tax imposed by [former] Code Section 48-9-3 upon the sale, use, or consumption, as defined in [former] Code Section 48-8-2, of motor fuel in this state." Former OCGA § 48-9-14 (a), (b) (1) (2014).

(ii) *Retail sales taxes on motor fuels*

In 1929, the General Assembly enacted a sales tax "upon every person engaging or continuing within this State in the business of selling any tangible property whatsoever, real or personal" of "two mills on the dollar of the gross receipts of the business." Ga. L. 1929, pp. 103, 106, § 4. This tax was held to apply to retail sales of gasoline. See Standard Oil Co. of Kentucky v. State Revenue Comm., 179 Ga. 371, 374-375 (176 SE 1) (1934). Unlike the excise tax on distributors of motor fuels, the legislation authorizing the sales tax on retail sales did not dedicate any revenues to the state highway system. See generally Ga. L. 1929, pp. 103-117, §§ 1-28. The 1929 sales tax act had a sunset

11

provision ending the sales tax on January 1, 1932. See Ga. L. 1929, p. 116, §

26.

In 1951, the legislature passed the Georgia Retailers' and Consumers'

Sales and Use Tax Act, which levied a state tax on retailers and consumers of

tangible personal property — including motor fuels — at a rate of three percent

of the retail sales price. See Ga. L. 1951, pp. 360, 362-368, 372-374, §§ 2, 3,

and 12. The Georgia Retailers' and Consumers' Sales and Use Tax Act initially

did not allow local governments to levy sales and use taxes. Id., p. 387, § 25.

That restriction was partially lifted in 1975 when the Act was amended to

authorize counties to levy local sales and use taxes. Ga. L. 1975, pp. 984, 985-

986, § 2. That amendment provided that, subject to approval by referendum,

> the governing authority of each county is empowered to impose a
> sales and use tax authorized by this Act at the rate of 1%.
> Otherwise, the tax imposed shall correspond, so far as is
> practicable, except as to rate, with the Georgia Retailers' and
> Consumers' Sales and Use Tax Act, . . . and no item or transaction
> which is not subject to taxation under the provisions of said Act
> shall be subject to the tax levied pursuant to this Section.

Id., p. 986, § 2. Three years after allowing counties to impose local sales taxes,

the power to levy local sales taxes was extended to municipalities. See Ga. L.

1978, pp. 309, 640, § 2.

In 1979, the General Assembly passed legislation converting the joint county and municipal sales taxes into local special district taxes. See Ga. L. 1979, pp. 446, 446-457, §§ 1, 2 (short title, "Georgia Retailers and Consumers' Sales and Use Tax Act Amended–Local Option Sales Tax"). The 1979 Act carried forward the provision that no local sales tax could be imposed on an item or transaction not subject to a state sales tax, but added an exception to allow a joint tax on the sales of motor fuels. Id, p. 447, § 1. In that same year, the General Assembly exempted from the state sales tax the sale of most motor fuels. Ga. L. 1979, pp. 1278, 1278-1279, §§ 1, 2.

In 1989, the General Assembly reduced the exemption for motor fuels from state sales and use taxes. In addition to increasing the state sales tax to four percent, the legislature struck the exemption for the sales of motor fuel codified at OCGA § 48-8-3 (43), and enacted OCGA § 48-8-3.1, which provided that the "sales of motor fuels . . . shall be exempt from the first 3 percent of the sales and use taxes levied or imposed by this article and shall be subject to the remaining 1 percent of the sales and use taxes levied or imposed by this article." See Ga. L. 1989, pp. 62, 63-65, §§ 2, 4. In enacting OCGA § 48-8-3.1 (c), the legislature also statutorily declared:

It is specifically declared to be the intent of the General Assembly that taxation imposed on sales of motor fuel wholly or partially subject to taxation under this Code section shall not constitute motor fuel taxes for purposes of any provision of the Constitution providing for the automatic or mandatory appropriation of any amount of funds equal to funds derived from motor fuel taxes.

Ga. L. 1989, p. 65, § 4.[4]  As a result of the 1989 changes, and until passage of HB 170, although a purchaser of most kinds of tangible personal property had to pay a four percent tax on the sales price of the purchase, a purchaser of motor fuels used for purposes of propelling vehicles on highways paid a one percent tax.  See OCGA § 48-8-3.1 (a) (2014) ("[S]ales of motor fuels . . . shall be exempt from the first 3 percent of the sales and use taxes levied or imposed by this article . . . "), (b) ("Sales of motor fuel other than gasoline . . . purchased for purposes other than propelling motor vehicles on public highways . . . shall be

---

[4] To the extent that this declaration could be read as defining the constitutional term "motor fuel taxes," it was ineffective. As we have already explained, the term "motor fuel taxes" means today what it meant the moment it entered the Constitution. Although we consider many legislative acts today in determining the meaning of "motor fuel taxes," we consider those acts only as meaningful context that informs our determination of what the words meant when the Motor Fuel Provision was enacted. A legislative declaration decades later cannot change that meaning. The interpretation of constitutional text is a judicial function, not a legislative one.  See, e.g., Carroll v. Wright, 131 Ga. 728, 737 (63 SE 260) (1908) (the "mere fact that the legislature has enacted a law . . . can not change the constitution").

14

fully subject to the 4 percent sales and use taxes[.]"); see also OCGA § 48-8-30 (b) (1) (imposing four percent rate on purchase of tangible property).

(iii) *HB 170*

In 2015, the legislature passed HB 170, which again amended the tax structure on motor fuels. Before HB 170, distributors were assessed two taxes under the Motor Fuel Tax Law — the First Motor Fuel Tax and the Second Motor Fuel Tax. As of July 1, 2015, the effective date of HB 170, the Second Motor Fuel Tax was repealed. See Ga. L. 2015, pp. 236, 250, § 5-14. Now, distributors are assessed only the First Motor Fuel Tax found in OCGA § 48-9-3, although the rate increased from 7.5 to 29 cents per gallon for diesel fuel and 26 cents per gallon for all other motor fuels. Id., p. 247, §§ 5-13. HB 170 also exempted sales of gasoline from state sales and use taxes, but not from local sales and use taxes. Id., pp. 242-243, §§ 5-2, 5-4. HB 170 also placed a cap on the tax rate of certain local sales and use taxes, limiting these taxes to a rate of one percent of the retail sales price of motor fuels which is not more than $3.00 per gallon. See id., pp. 244-246, §§ 5-8 – 5-12.

(iv) *History of constitutional provision earmarking tax revenues from motor fuel taxes*

Eight years after enacting the Motor Fuel Tax Law in 1937, the State adopted the Constitution of 1945. The 1945 Constitution carried forward a section providing that "[n]o money shall be drawn from the Treasury except by appropriation made by law," and contained a new section entitled "Appropriation Control" that, among other things, provided that appropriations "shall be for a specific sum of money and no appropriation shall allocate to any object the proceeds of any particular tax or fund or a part or percentage thereof." Gregory v. Hamilton, 215 Ga. 735, 736-737 (113 SE2d 395) (1960) (citing Ga. Const. of 1945, Art. III, Sec. VII, Par. XI and Art. VII, Sec. IX, Par. IV). "At the time the Constitution of 1945 was adopted, there were in existence several laws which levied specific taxes and provided that the proceeds from the collection of the taxes were for the sole use of a particular department or agency of government," including the allocation of motor fuel taxes (Code Ann. § 92-1404 of the 1933 Georgia Code) and motor vehicle license tag fees. Id. at 737. But the Constitution of 1945 "end[ed] the practice of allocating or earmarking particular taxes for the use by any specific department," including the statutory earmarking of motor fuel taxes in Code Ann. § 92-1404 of the 1933 Georgia Code. Id. This invalidation of the statutory earmarking of Code Ann. § 92-1404 was made

16

express when, in 1949, the legislature expressly repealed the earmarking provisions of the statute in conformance with the 1945 Constitution. See Ga. L. 1949, pp. 19, 20-21, § 3.

In 1952, the Constitution of 1945 was amended to add a new subsection to the Appropriation Control section that required the General Assembly to appropriate funds for highways in an amount not less than the total motor fuel and motor vehicle license taxes received by the State treasury in the preceding fiscal year. See Gregory, 215 Ga. at 738; see also Ga. L. 1951, pp. 849, 850-852, § 1 (February 21, 1951 resolution proposing amendment to Constitution of 1945). The 1952 constitutional amendment provided:

> To defray the cost of all activities incident to providing and maintaining an adequate system of public roads and bridges in this State as authorized by laws enacted by the General Assembly of Georgia, and for grants to counties for aid in county road construction and maintenance as provided by law authorizing the State treasury to make such grants, the General Assembly of Georgia shall in each General Appropriation Act make the aggregate of the fixed appropriations for highway purposes an amount not less than the total motor fuel and motor vehicle license taxes received by the State treasury for the immediately preceding fiscal year, less the amount of refunds, rebates, and collection costs authorized by law. . . . Said funds are hereby allocated to the Highway Department and shall be utilized for highway improvement including construction and maintenance.

Ga. Const. of 1945, Art. VII, Sec. IX, Par. IV (b).  This is the first time the phrase "motor fuel . . . taxes" was used in the Constitution. But eight years later, we held in Gregory that the 1952 amendment was not self-executing and did not appropriate any funds for use by the State Highway Department; rather, it simply required the General Assembly to do so. 215 Ga. at 739.

Mere months after our decision in Gregory, the 1945 Constitution was amended again to earmark specifically for roads and bridges an amount equal to all money derived from motor fuel taxes:

> An amount equal to all money derived from motor fuel taxes received by the State Treasurer in each of the immediately preceding fiscal years, less the amount of refunds, rebates and collection costs authorized by law, is hereby appropriated for the fiscal year beginning July 1, of each year following, for all activities incident to providing and maintaining an adequate system of public roads and bridges in this State, as authorized by laws enacted by the General Assembly of Georgia; and for grants to counties for aid in county road construction and maintenance, as provided by law authorizing the State Treasurer to make such grants. Said sum is hereby appropriated for, and shall be available for, the aforesaid purposes regardless of whether the General Assembly enacts a General Appropriations Act and said sum need not be specifically stated in any General Appropriations Acts passed by the General Assembly in order to be available for such purposes. However, this shall not preclude the General Assembly from appropriating for such purposes an amount greater than the sum specified above for such purposes.

18

Ga. L. 1960, pp. 1297, 1297-1299, § 1; see also <u>Brown v. Wright</u>, 231 Ga. 686, 688-689 (III) (203 SE2d 487) (1974).  The 1960 Amendment was brought forward into Article III, Section X, Paragraph VII (b) of the 1976 Constitution with minor changes, and was again adopted in our current 1983 Constitution, which provides in pertinent part:

> An amount equal to all money derived from motor fuel taxes received by the state in each of the immediately preceding fiscal years, less the amount of refunds, rebates, and collection costs authorized by law, is hereby appropriated for the fiscal year beginning July 1, of each year following, for all activities incident to providing and maintaining an adequate system of public roads and bridges in this state, as authorized by laws enacted by the General Assembly of Georgia, and for grants to counties by law authorizing road construction and maintenance, as provided by law authorizing such grants. Said sum is hereby appropriated for, and shall be available for, the aforesaid purposes regardless of whether the General Assembly enacts a general appropriations Act; and said sum need not be specifically stated in any general appropriations Act passed by the General Assembly in order to be available for such purposes. However, this shall not preclude the General Assembly from appropriating for such purposes an amount greater than the sum specified above for such purposes. . . .

Ga. Const. of 1983, Art. III, Sec. IX, Par. VI (b).

In sum, from 1927 through the enactment of the Motor Fuel Provision (and, much less relevantly, through today), revenues generated by taxes imposed by the Motor Fuel Tax Law have been earmarked for roads and bridges.

19

Conversely, the parties have not suggested – and our independent research does not reveal – that revenues from sales and use taxes generally applicable to sales of tangible personal property, including motor fuels, were ever earmarked for roads and bridges.

B. *Plaintiffs' claims were properly dismissed because the Constitution's automatic appropriation of "motor fuel taxes" does not apply to generally applicable retail sales taxes that incidentally applied to sales of motor fuel.*

We first address the merits of Plaintiffs' arguments regarding the denial of their mandamus claims, because these claims are not barred by sovereign immunity. See SJN Properties, LLC v. Fulton County. Bd. of Assessors, 296 Ga. 793, 799 (2) (b) (ii) (770 SE2d 832) (2015). Plaintiffs' mandamus claims fail because they rest on the mistaken premise that local sales and use taxes on the sale of motor fuel constitute "motor fuel taxes" within the meaning of the Constitution. This conclusion is fatal also to Plaintiffs' other claims, and thus we need not address the other issues presented as to those claims.

To be entitled to mandamus relief, a claimant must establish that "(1) no other adequate legal remedy is available to effectuate the relief sought; and (2) the applicant has a clear legal right to such relief." SJN Properties, 296 Ga at

20

800 (2) (b) (ii) (citation and punctuation omitted). "A clear legal right to the relief sought may be found only where the claimant seeks to compel the performance of a public duty that an official or agency is required by law to perform." Bibb County v. Monroe County, 294 Ga. 730, 735 (2) (b) (755 SE2d 760) (2014).

The trial court concluded that Plaintiffs had an adequate legal remedy to challenge the constitutionality of HB 170 by pursuing a refund action under OCGA § 48-2-35, but this conclusion was erroneous. Plaintiffs concede that they do not seek a tax refund and are willing to pay the local sales and use taxes on motor fuels. They argue that the tax refund statute is inadequate to effectuate the relief they seek, which is to ensure that prospective revenue from sales and use taxes on motor fuels is dedicated to the construction and maintenance of roads and bridges. Under the general refund statute, a taxpayer shall be refunded any and all erroneously or illegally assessed taxes. OCGA § 48-2-35 (a). But Plaintiffs do not argue that HB 170 illegally assesses taxes against them. Rather, they argue that it violates the Constitution by allowing revenues from taxes on motor fuels to be apportioned for purposes other than on roads and bridges. And the relief they seek is broader than the relief provided by the statute, which

21

is limited to a refund of the assessed taxes plus interest.  OCGA § 48-2-35 (a).

The trial court thus erred in concluding that the refund statute was an adequate

legal remedy for Plaintiffs' claims.

But Plaintiffs still cannot prevail on their mandamus claim. As the trial

court correctly held, none of the defendants had a duty to earmark revenues from

local sales taxes on motor fuels for public roads, and thus Plaintiffs had no clear

legal right to compel such performance. Plaintiffs argue that Defendants had a

clear legal duty to ensure that local state and use taxes on motor fuel, as

amended by HB 170, were spent on public roads and bridges. Plaintiffs'

argument cannot survive the history we have already discussed.

The historical development of the Motor Fuel Provision demonstrates that

the term "motor fuel taxes" means those motor fuel taxes levied on distributors,

not the local sales and use taxes generally applicable to all sorts of tangible

personal property.[5]  The history of dedicating revenues from taxes on motor

fuels to the construction of state roads began in 1927, when the legislature first

imposed a tax on distributors of motor fuels.  See Ga. L. 1927,  pp. 104, 105-

---

[5] Indeed, those general sales taxes are "motor fuel taxes" only in the sense that they are also "pencil taxes" and "umbrella taxes." The Constitution's use of the term "motor fuel taxes" clearly refers to a tax that applies to motor fuel in a unique way that generally applicable sales taxes do not.

22

106, §§ 1 and 2. That legislation was amended several times, being called the "Motor-Fuels; Taxation and Allocation" Act in 1929, and statutorily defined as the "Motor-Fuel Tax Law" in 1937. The Motor-Fuel Tax Law mandated that the funds collected from the taxes on distributors of motor fuels be allocated for public road expenditures, as well as to the State's equalization fund for public schools. See Ga. L. 1937, pp. 167, 180, § 1. The adoption of the 1945 Constitution ended this earmarking practice, but a constitutional amendment purporting to reinstate it was adopted in 1952. See Gregory, 215 Ga. at 738. Although the effect of this constitutional amendment did not actually appropriate the net proceeds of motor fuel taxes to public roads, see Gregory, 215 Ga. at 739, the scope of the amendment's application was clear based on the historical circumstances.

As we noted in Gregory, at the time the 1945 Constitution was adopted, there were in existence several laws that levied specific taxes and dedicated the proceeds from those taxes for particular use. Id. at 737. Among those were the motor vehicle license tag fees (Ga. L. 1937, pp. 155, 166, § 11; Code 1933, § 92-2912) and the motor fuel taxes that Code Ann. § 92-1404 levied on distributors (Ga. L. 1937, pp. 167, 180, §1; Code 1933, § 92-1404). Gregory,

215 Ga. at 737. Although sales taxes on the retail selling of gasoline existed as early as 1929, see Standard Oil, 179 Ga. at 374-375, these taxes were never earmarked for roads and bridges, see generally Ga. L. 1929, pp. 103, 103-117, §§ 1-28. Thus, at the time of the 1952 Amendment, the historical practice was to earmark only those taxes imposed by Code Ann. § 92-1404, the motor fuel taxes on distributors. Consequently, when the 1952 Amendment was adopted to appropriate proceeds from "motor fuel taxes" to highway purposes, the use of the term "motor fuel taxes" in that amendment necessarily referred to former Code Ann. § 92-1404, the only statute that had dedicated revenues from "motor fuel taxes" to the construction and maintenance of public roads, and the only statute that used the phrase "motor fuel tax." The original meaning of the phrase "motor fuel taxes" in the 1952 Amendment meant those taxes levied by former Code Ann. § 92-1404 on distributors of motor fuels on a per gallon basis. Former Code Ann. § 92-1404, part of the Motor-Fuel Tax Law, is now found at OCGA § 48-9-3.

As we have explained, the phrase "motor fuel taxes" can be traced back to the 1952 Amendment that reinstated the earmarking of motor fuel taxes (along with motor vehicle license fees). And as we have explained, the text of

the Constitution means today what it meant when it was initially adopted. Given the historical context of that phrase in Georgia law prior to 1952, the use of "motor fuel taxes" in the 1952 Amendment, the 1960 Amendment, and the Motor Fuel Provision in its current incarnation all meant the same thing: the per-gallon taxes imposed on distributors in 1952 as Code Ann. § 92-1404 and now as OCGA § 48-9-3. Contrary to Plaintiffs' claims, the local sales and use taxes authorized by HB 170 are separate and distinct from the taxes under OCGA § 48-9-3 and are not "motor fuel taxes" as that term is used in the Motor Fuel Provision. As a result, Defendants had no duty to appropriate for public roads an amount of revenue equal to the proceeds from local sales and use taxes, and Plaintiffs' mandamus claims fail.

Because Plaintiffs' claims for equitable and declaratory relief hinge on a duty to so appropriate the revenues from sales and use taxes, these claims, even if not barred by sovereign immunity, fail as well. Plaintiffs' request for attorneys' fees is derivative of their substantive claims and similarly fails. We affirm the trial court's dismissal of Plaintiffs' complaint.

Judgment affirmed. Hines, C. J., Melton, P. J., Benham, Hunstein, Nahmias, Blackwell, and Boggs, JJ., and Presiding Judge Stephen Louis A. Dillard concur. Grant, J., disqualified.

Decided June 5, 2017.

Mandamus. Fulton Superior Court. Before Judge McBurney.

Carr & Palmer, W. Pitts Carr, Alexander D. Weatherby, for appellants.

Christopher M. Carr, Attorney General, W. Wright Banks, Jr., Deputy Attorney General, Warren R. Calvert, Senior Assistant Attorney General, Alex F. Sponseller, Senior Assistant Attorney General, J. Scott Forbes, Assistant Attorney General, for appellees.

G. Joseph Scheuer, Kelly J. Long Pridgen; Sam L. Brannen, Jr., Rusi C. Patel, Susan J. Moore, amici curiae.