NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 19, 2023

S23A0631. ROBERTS v. CUTHPERT

LAGRUA, Justice.

Georgia law permits a person who has been denied a weapons carry license by a probate judge to "bring an action in mandamus or other legal proceeding in order to obtain" such a license.[1] The law further provides that "[i]f such applicant is the prevailing party, he or she shall be entitled to recover his or her costs in such action, including reasonable attorney's fees."[2] We hold today that the General Assembly waived sovereign immunity for claims brought under OCGA § 16-11-129 (j) and that the Separation of Powers Provision of the Georgia Constitution is not implicated by the recovery of costs, including reasonable attorney's fees, against a probate judge pursuant to OCGA § 16-11-129 (j) because processing

---

[1] OCGA § 16-11-129 (j).
[2] Id.

1

a weapons carry license does not involve the exercise of judicial power. We also conclude that the probate judge in this case waived the defense of judicial immunity on the costs-and-fees claim asserted against him in his official capacity. Thus, we affirm in part and reverse in part the judgment of the superior court.

1. In April 2019, Kevin Gary Roberts applied to Judge Clarence Cuthpert, Jr., probate judge for Rockdale County, for a weapons carry license pursuant to OCGA § 16-11-129. Judge Cuthpert denied Roberts's application, finding that Roberts's criminal history revealed five arrests between 1992 and 2004 for aggravated assault, affray, obstruction of the judiciary, cruelty to children in the first degree, simple battery, battery, and family violence battery. Judge Cuthpert noted that Roberts's criminal history did not list the dispositions of Roberts's arrests for obstruction of the judiciary[3] or simple battery, but the other arrests had dispositions of not prosecuted, dismissed, or nolle prossed. Judge Cuthpert concluded

---

[3] Judge Cuthpert noted that Roberts's criminal history did not identify whether this particular charge was a felony or a misdemeanor.

2

that Roberts "lack[ed] good moral character[4] . . . [d]ue to his arrest[s] for several violent offenses" and that "the court need[ed] additional information[, including police reports,] to determine if this application should be approved." Judge Cuthpert advised Roberts that he could file a motion for reconsideration, which Roberts filed.

At the reconsideration hearing, Roberts did not provide any police reports relating to his arrests or any information about how his arrests that were listed without a disposition in his background check were ultimately resolved. However, Roberts testified at the hearing that he had never been convicted of a felony or of a misdemeanor crime of domestic violence. After the hearing, Judge Cuthpert denied the motion for reconsideration, concluding that, "[b]ased upon [Roberts's] history of violent offenses and failure to

---

[4] OCGA § 16-11-129 (d) (4) provides that

the judge of the probate court shall issue such applicant a license . . . unless facts establishing ineligibility have been reported or unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section.

3

comply with the Court's instructions to provide the incident reports and dispositions for [his previous five arrests]," Roberts was "not of good moral character."

Soon thereafter, Roberts filed a complaint against Judge Cuthpert in the Rockdale County Superior Court seeking mandamus relief against Judge Cuthpert "in his official capacity," declaratory judgment against Judge Cuthpert "in both his official and individual capacities," and costs and attorney's fees. In Judge Cuthpert's answer, he asserted that the defenses of judicial immunity and official immunity barred any damages claim against him in his individual capacity and that sovereign immunity barred any damages claim against him in his official capacity. While the suit was pending, Roberts substituted Judge Gary Washington for Judge Cuthpert in his official capacity,[5] but noted that Judge Cuthpert continued as a defendant in his individual capacity.[6]

---

[5] We note that the superior court did not enter an order of substitution, which it was not required to do under OCGA § 9-11-25 (d) (1), but the better practice would have been to enter one.

[6] We note however that claims for declaratory judgment against public

4

The parties filed cross-motions for summary judgment, and the superior court granted summary judgment in favor of Roberts on his mandamus claim, concluding that Roberts "ha[d] a clear legal right to a weapons carry license," and ordered Judge Washington to provide Roberts with a weapons carry license. Judge Washington did not appeal the superior court's grant of mandamus relief.[7]

Subsequently, Roberts filed a motion for costs, including reasonable attorney's fees, under OCGA § 16-11-129 (j). In response, the probate judges argued in part that judicial immunity barred Roberts's costs-and-fees claim "against Judge Cuthpert personally" and that sovereign immunity barred the costs-and-fees claim

---

officials in their individual capacity generally become moot once that official is no longer in office. See *Georgia Dept. of Human Servs. v. Addison*, 304 Ga. 425, 429 (1) n.5 (819 SE2d 20) (2018) (concluding that claims for declaratory judgment against a public official in his individual capacity became moot once he was "no longer employed by the State of Georgia" because "he can no longer give the plaintiffs any of the relief they seek").

[7] Because the mandamus ruling was not appealed to this Court, it has been conclusively established for purposes of this litigation that Roberts had a clear legal right to a weapons carry license. So although some of us doubt that mandamus was properly granted in this case, we do not decide on that question.

"against Judge Washington in his official capacity."[8] After briefing, the superior court denied Roberts's motion for costs, concluding (1) the General Assembly waived sovereign immunity by enacting OCGA § 16-11-129 (j); (2) the doctrine of judicial immunity barred the costs-and-fees claim against the probate judges in their "individual and official capacity"; and (3) the recovery of costs and attorney's fees was unconstitutional under the Separation of Powers Provision of the Georgia Constitution. See Ga. Const. of 1983, Art. I, Sec. II, Par. III.

Roberts timely appealed the superior court's order, but he appeals only the costs-and-fees claim against the probate judge in

---

[8] We note that while Judge Cuthpert asserted in his answer the defense of official immunity for the claims asserted against him in his individual capacity, he did not raise this defense in response to Roberts's motion for fees. See Ga. Const., Art. I, Sec. II, Par. IX (d) (providing official immunity for "officers and employees of the state or its departments and agencies"). See also *Gilbert v. Richardson*, 264 Ga. 744, 752-753 (6) (452 SE2d 476) (1994) (holding that a county official was entitled to official immunity under Article I, Section II, Paragraph IX (d) of the Georgia Constitution). "The doctrine of official immunity . . . provides that while a public officer or employee may be personally liable for his negligent ministerial acts, he may not be held liable for his discretionary acts unless such acts are willful, wanton, or outside the scope of his authority." Id. at 752 (6). But because the only claim remaining before us is against Judge Washington in his official capacity, we need not address the applicability of official immunity.

6

his official capacity. Thus, the superior court's ruling that the doctrine of judicial immunity barred the costs-and-fees claim against the probate judge in his individual capacity is not before this Court, and we address the superior court's sovereign-immunity ruling below.[9]

2. *The General Assembly waived sovereign immunity when it enacted OCGA § 16-11-129 (j).*

"The doctrine of sovereign immunity, as enshrined in our Constitution, bars suits against the State and its employees in their official capacities unless a statute or the Constitution itself specifically waives that immunity." *State v. SASS Group, LLC*, 315 Ga. 893, 893 (885 SE2d 761) (2023). Absent a waiver, a probate judge sued in his official capacity enjoys sovereign immunity because styling a claim against a county officer in his official capacity is

---

[9] Although the probate judge did not appeal the superior court's ruling on sovereign immunity, we nevertheless address it because "the applicability of sovereign immunity is a threshold determination, and, if it does apply, a court lacks jurisdiction over the case and, concomitantly, lacks authority to decide the merits of a claim that is barred." *McConnell v. Dept. of Labor*, 302 Ga. 18, 19 (805 SE2d 79) (2017).

7

simply a way of pleading a claim against the county itself. *Camden County v. Sweatt*, 315 Ga. 498, 502 (2) n.12 (883 SE2d 827) (2023) (citation and punctuation omitted; emphasis in original). See also *Gilbert v. Richardson*, 264 Ga. 744, 746-747 (2) (452 SE2d 476) (1994) (holding state's sovereign immunity extends to counties).

Turning to the relevant statute, we have previously explained: "In OCGA § 16-11-129, the General Assembly set out a streamlined procedure for processing applications for weapons carry licenses. An applicant initiates the process by submitting an application under oath to a probate judge, having his or her photograph and fingerprints taken, and paying the required fees." *Bell v. Hargrove*, 313 Ga. 30, 32-33 (2) (867 SE2d 101) (2021).

> After receiving the application, a probate judge must direct the appropriate law enforcement agency in the county, to . . . (1) . . . request a fingerprint based criminal history records check from the Georgia Crime Information Center and Federal Bureau of Investigation for purposes of determining the suitability of the applicant and return an appropriate report to the judge of the probate court; (2) conduct a background check using the Federal Bureau of Investigation's National Instant Criminal Background Check System and return an appropriate report to the probate judge; and (3) when a person who is not a United

States citizen applies for a weapons carry license, conduct a search of the records maintained by United States Immigration and Customs Enforcement and return an appropriate report to the probate judge.

*Bell*, 313 Ga. at 33 (2) (citations and punctuation omitted). "Based on the records check results, the county law enforcement agency must then report to the probate judge 'any findings relating to the applicant which may bear on his or her eligibility for a weapons carry license.'" Id. at 33 (2) (quoting OCGA § 16-11-129 (d) (4)). Within "ten days after" receiving the report from the appropriate law enforcement agency,

> the judge of the probate court shall issue such applicant a license or renewal license to carry any weapon unless facts establishing ineligibility have been reported or unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section.

OCGA § 16-11-129 (d) (4). The statute further provides:

> When an eligible applicant fails to receive a license, temporary renewal license, or renewal license within the time period required by this Code section and the application or request has been properly filed, the applicant may bring an action in *mandamus* or other legal proceeding in order to obtain a license, temporary renewal

9

license, or renewal license. When an applicant is otherwise denied a license, temporary renewal license, or renewal license and contends that he or she is qualified to be issued a license, temporary renewal license, or renewal license, the applicant may bring an action in mandamus or other legal proceeding in order to obtain such license. Additionally, the applicant may request a hearing before the judge of the probate court relative to the applicant's fitness to be issued such license. Upon the issuance of a denial, the judge of the probate court shall inform the applicant of his or her rights pursuant to this subsection. If such applicant is the prevailing party, he or she shall be entitled to recover his or her costs in such action, including reasonable attorney's fees.

OCGA § 16-11-129 (j) (emphasis supplied).

The Georgia Constitution provides that "[t]he sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. Art. I, Sec. II, Par. IX. We have recognized that while "implied waivers of governmental immunity should not be favored, . . . this does not mean that the [General Assembly] must use specific magic words such as 'sovereign immunity is hereby waived' in order to create a specific statutory

10

waiver of sovereign immunity." *City of Union Point v. Greene County*, 303 Ga. 449, 453 (1) (812 SE2d 278) (2018).

Here, OCGA § 16-11-129 (j) expressly authorizes a cause of action against a public official, i.e., the probate judge, based on the denial of an application for a weapons carry license. In order for OCGA § 16-11-129 (j) to have any meaning at all, it can only be interpreted as creating a waiver of sovereign immunity. See *City of College Park v. Clayton County*, 306 Ga. 301, 314 (3) (830 SE2d 179) (2019) (concluding that a statute which "expressly authorize[d] claimants to seek relief against a public official . . . amount[ed] to a specific waiver of sovereign immunity when public officials are sued in their official capacities"). Thus, OCGA § 16-11-129 (j) is an implicit waiver of sovereign immunity in the limited circumstances provided therein, that is, when an "applicant is the prevailing party" on an official-capacity claim, like here, the applicant "shall be entitled to recover his or her costs in such action, including reasonable attorney's fees." OCGA § 16-11-129 (j). Accordingly, we affirm the superior court's ruling that sovereign immunity is waived

11

for the claims before us.

3. *The probate judge waived the defense of judicial immunity for the costs-and-fees claim asserted against him in his official capacity.*

Roberts contends the superior court erred by concluding that the doctrine of judicial immunity barred Roberts's costs-and-fees claim under OCGA § 16-11-129 (j) against the probate judge in his official capacity. Without deciding whether judicial immunity is available as a defense in official-capacity claims, we conclude that the probate judge waived any defense of judicial immunity for the costs-and-fees claim asserted against him in his official capacity.

"Absolute judicial immunity has protected judicial actions from suit since medieval times." *Stanley v. Patterson*, 314 Ga. 582, 583 (2) (878 SE2d 529) (2022) (citing *Forrester v. White*, 484 U. S. 219, 225 (III) (108 SCt 538, 98 LE2d 555) (1988)).[10]

---

[10] As we noted in *Stanley*:
The scope and nature of judicial and quasi-judicial immunity under Georgia law is a question of state law, not federal law. Accordingly, United States Supreme Court precedent on this point

12

> Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.

*Mireles v. Waco*, 502 U.S. 9, 10 (112 SCt 286, 116 LE2d 9) (1991) (citation and punctuation omitted). But the defense of judicial immunity is an affirmative defense that can be waived. See *Spann v. Davis*, 312 Ga. 843, 846-848 (1) (866 SE2d 371) (2021). While the defense of judicial immunity need not necessarily be asserted in a responsive pleading or motion, the defense is waived if it is not raised any time before judgment. See id. at 851 (2) (citation and punctuation omitted). And trial courts lack the authority to sua sponte dismiss claims based on a waivable affirmative defense that has not been raised. See id. at 847 (1) (A sua sponte dismissal "based on an affirmative defense that has not been raised is particularly

---

is persuasive only, not binding. But we view that precedent as quite persuasive, given its thorough assessment of the common-law basis of federal judicial immunity that also formed the basis for Georgia's judicial immunity doctrine.
Id., 314 Ga. at 584 (2) n.3.

13

problematic because . . . a party seeking protection from suit on the basis of immunity bears the burden of establishing that he or she is entitled to that protection.").

Here, as shown in Division 1, the record establishes that the probate judge asserted the defense of judicial immunity only for the individual-capacity claims and did not assert the defense of judicial immunity for the costs-and-fees claim asserted against him in his official capacity at any time prior to the superior court's denial of Roberts's motion for costs. Thus, the probate judge waived whatever defense of judicial immunity might have been available for the costs-and-fees claim asserted against him in his official capacity.[11] See

---

[11] Because we conclude that the probate judge waived the defense of judicial immunity for the costs-and-fees claim asserted against him in his official capacity, we do not address whether the defense of judicial immunity is available when a judge is sued in his or her official capacity, as opposed to his or her individual capacity. See *Kimberly Regenesis, LLC v. Lee County*, 64 F4th 1253, 1259 (11th Cir. 2023) ("The [United States] Supreme Court has made clear, for example, that an official in a [individual]-capacity action may be able to assert personal immunity defenses (like quasi-judicial immunity) but that these defenses are unavailable in a suit against a municipality." (citation and punctuation omitted)). See also *Lathrop v. Deal*, 301 Ga. 408, 425 (III) (801 SE2d 867) (2017) ("[A] suit against a state officer in his official capacity amounts to a suit against the State itself, and the doctrine of sovereign immunity bars suits against the State to which the State has not consented." (citation omitted)).

14

*Spann*, 312 Ga. at 851 (2). Accordingly, the superior court erred in sua sponte ruling that the defense of judicial immunity barred Roberts's costs-and-fees claim against the probate judge in his official capacity, and this ruling by the superior court is reversed. See id. at 846-848 (1) (concluding the trial court erred in ruling sua sponte on the issue of quasi-judicial immunity).

4. *The recovery of costs, including reasonable attorney's fees, against a probate judge under OCGA § 16-11-129 (j) does not violate the Separation of Powers Provision of the Georgia Constitution.*

Roberts also contends the superior court erred by concluding that the Separation of Powers Provision barred Roberts's recovery of costs, including reasonable attorney's fees, under OCGA § 16-11-129 (j). In declaring the costs-and-fees provision of OCGA § 16-11-129 (j) unconstitutional, the superior court concluded that the legislative branch infringed on judicial independence by enacting a statute which causes judges to be financially liable for exercising their judicial power when denying an application for a weapons carry license. However, as explained below, we conclude that

15

probate judges do not exercise judicial power when they grant or deny an application for a weapons carry license under OCGA § 16-11-129, and therefore, the Separation of Powers Provision is not implicated by the recovery of costs, including reasonable attorney's fees, under OCGA § 16-11-129 (j).

(a) *Separation-of-Powers Principles*

The Georgia Constitution provides that "[t]he legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided." Ga. Const. of 1983, Art. I, Sec. II, Par. III. See also *Caldwell v. Bateman*, 252 Ga. 144, 148 (5) (312 SE2d 320) (1984) ("The plain words of the Constitution prohibit a person from simultaneously discharging the duties and functions of more than one branch."). Every Georgia Constitution has provided for separated powers, and the current Separation of Powers Provision has remained unchanged since 1877. See *Black Voters Matter Fund, Inc. v. Kemp*, 313 Ga. 375, 397 (2) n.27 (870 SE2d 430) (2022)

16

(Peterson, J., concurring). Under our system of government, "[t]he legislative branch enacts the law, the judiciary interprets those laws and the executive branch enforces those laws until they are amended or held to be unconstitutional." *Steiner*, 303 Ga. at 904 (V) (citation and punctuation omitted). "[I]ndeed, there is no liberty, if the power of judging be not separated from the legislative and executive powers." *Beall v. Beall*, 8 Ga. 210, 229 (26) (1850) (emphasis omitted). And the Judicial Power Paragraph of the Georgia Constitution has long vested judicial power in probate courts. See Ga. Const. of 1983, Art. VI, Sec. I, Par. I (vesting the judicial power of the state "exclusively" in various "classes of courts," including probate courts); Ga. Const. of 1861, Art. IV, Sec. I, Par. I (vesting the judicial power of the state in various courts, including probate courts). See also *Tucker v. Harris*, 13 Ga. 1, 8 (7) (1853) (The probate courts "are not created by Statute; they are *constitutional* Courts." (emphasis in original)).

Our decisions about whether a challenged law violates the Separation of Powers Provision by infringing on the judicial power

17

have looked to whether the law burdens the exercise of a judicial function. See, e.g., *Steiner*, 303 Ga. at 896-905 (V) (concluding there was no violation of the Separation of Powers Provision because the executive branch employee did not perform a judicial function); *Brown v. Scott*, 266 Ga. 44, 45-46 (1) (464 SE2d 607) (1995) (concluding there was a violation of the Separation of Powers Provision because the executive branch employee performed both executive and judicial functions); *Georgia Dept. of Human Resources v. Word*, 265 Ga. 461, 463 (1) (458 SE2d 110) (1995) (concluding there was no violation of the Separation of Powers Provision because there was no "infringe[ment] on any judicial function"); *Northside Manor, Inc. v. Vann*, 219 Ga. 298, 300 (133 SE2d 32) (1963) (concluding there was a violation of the Separation of Powers Provision because there was an "usurpation of exclusive judicial functions").

"The Judicial Power Paragraph does not purport to define what is meant by the judicial power." *Sons of Confederate Veterans v. Henry County Board of Commissioners*, 315 Ga. 39, 47 (2) (a) (880

18

SE2d 168) (2022). But "resolving private-rights disputes has been historically recognized as the core of judicial power." Id. at 47-48 (2) (a) (citation and punctuation omitted). "The judicial power is that which declares what law is, and applies it to past transactions and existing cases; it expounds and judicially administers the law; it interprets and enforces the law in a case in litigation." Id. at 50 (2) (b) (citation and punctuation omitted). Thus, "[in] general, judicial functions are those involved in resolving disputes between parties who have invoked the jurisdiction of a court." *Stanley*, 314 Ga. at 584 (2) (citation and punctuation omitted). See, e.g., *Georgia Dept. of Human Svcs. v. Steiner*, 303 Ga. 890, 905 (V) (815 SE2d 883) (2018) (concluding in part that an investigator with the executive branch did not perform a judicial function because "[t]he investigator [wa]s not charged with hearing argument and testimony or deciding a dispute between parties"). Additionally, when performing a "judicial function . . . the [court] interprets, applies, and enforces existing law as related to subsequent acts of persons amenable thereto." *Fullwood v. Sivley*, 271 Ga. 248, 253

19

(517 SE2d 511) (1999). See also *Georgia Motor Trucking Assn. v. Georgia Dept. of Revenue*, 301 Ga. 354, 361 (2) (A) (ii) n.4 (801 SE2d 9) (2017) ("The interpretation of constitutional text is a judicial function, not a legislative one."). Although the key to determining whether an act is a judicial function is whether said act involves resolving a dispute between parties who have invoked the jurisdiction of a court, whether said act is "normally" performed by a judge may also be relevant. Cf. *Stanley*, 314 Ga. at 585 (2) ("[T]he lodestar of judicial and quasi-judicial immunity is whether the actions constitutes a function normally performed by a judge." (citation and punctuation omitted)).

Not everything a judge is called upon to do is properly considered a "judicial function." See *Stanley*, 314 Ga. at 584 (2) "Judicial functions are distinguished from 'administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform.'" Id. (quoting *Forrester*, 484 U.S. at 227 (III)). Although the judicial power is vested in the probate courts, we have also long acknowledged that probate judges, in particular, are

"not so exclusively judicial officers that certain administrative duties could not be required of them." *Carroll v. Wright*, 131 Ga. 728, 739 (4) (63 SE 260) (1908). See also id. at 739 (4) (noting that probate judges have the authority to issue marriage licenses but that such issuance "is not essentially and absolutely a judicial act").

(b) *Application*

Applying these principles here, we conclude that granting or denying a weapons carry license is not a judicial function. Simply put, the application for a weapons carry license does not involve the resolution of a dispute between parties or anything else inherent to the judicial role. See *Stanley*, 314 Ga. at 584 (2) (holding that "judicial functions are those involved in resolving disputes between parties" (citation and punctuation omitted)).

The fact that the General Assembly has statutorily assigned the grant or denial of a weapons-carry-license application to a probate judge does not transform the function into an exercise of judicial power; the Constitution, not statute, is what determines the lines between powers. This is also true given that the General

21

Assembly has explicitly assigned nonjudicial functions to probate judges for well over a century. See OCGA § 15-9-30 (b) (11) (providing that probate judges "shall . . . [p]erform [both] judicial and ministerial functions as may be provided by law"); *Comer v. Ross*, 100 Ga. 652, 652 (28 SE 387) (1897) (Probate judges are "charged with the performance of duties judicial, ministerial, and clerical. Not by his title, but only by his acts, can the exact capacity in which he appears ever be known upon any special occasion.").

Nor does the statute's requirement that the probate judge determine whether an applicant is of "good moral character" make the grant or denial of an application for a weapons carry license an exercise of the judicial power. As noted in Division 2, OCGA § 16-11-129 (d) (4) requires the probate judge to issue an applicant a weapons carry license "unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section." The determination of whether an applicant is of "good moral character" may involve the use of discretion, but the use of

discretion does not necessarily render something a judicial function because non-judges routinely employ the use of discretion as part of their nonjudicial functions. See, e.g., *Pryor Org., Inc. v. Stewart*, 274 Ga. 487, 490 (554 SE2d 132) (2001) (upholding the sheriff's "exercise of discretion" in revoking the license of a bail bondsman because he lacked "good moral character"); *Duty Free Air & Ship Supply Co./Franklin Wilson Airport Concession v. City of Atlanta*, 282 Ga. 173, 175 (646 SE2d 48) (2007) (concluding that the mayor's and city council's approval of any award resulting from competitive sealed bidding process for airport duty-free concessions contract was a discretionary act); *Bland Farms, LLC v. Georgia Dept. of Agriculture*, 281 Ga. 192, 192 (637 SE2d 37) (2006) (concluding that the relevant statute "simply confers on the [Commissioner of Agriculture] the general discretionary authority to undertake to protect the Vidalia trademark, and does not impose on him the express official duty to prohibit the use of other trademarks on Vidalia onion").

Further, many professional licensing schemes in Georgia

23

require non-judges to determine whether a person is of good moral character. See, e.g., *Stewart*, 274 Ga. at 489 (2) (regulating professional bondspersons); OCGA § 10-2-41 (regulating certified public weighers); OCGA § 15-14-29 (regulating court reporters); OCGA § 40-15-5 (regulating instructors in a motorcycle operator safety training program). Indeed, OCGA § 16-11-129 appears to be the only statutory licensing scheme where the determination of "good moral character" is made solely by a judge. Cf. OCGA § 43-21-51 (requiring license applicants to present their application "to the county commissioners or the judge of the probate court of the county in which [the roadhouse] business is to be operated"). But we are unaware of any authority supporting the proposition that, because "good moral character" determinations require the exercise of discretion, licensing board members, who are part of the executive branch, are performing a judicial function when making such determinations. See Ga. Const. of 1983, Art. VI, Sec. I, Par. I ("The judicial power of the state shall be vested exclusively in the following classes of courts: magistrate courts, probate courts, juvenile courts,

24

state courts, superior courts, state-wide business court, Court of Appeals, and Supreme Court.").[12]

Our conclusion that processing applications for weapons carry licenses is not a judicial function is bolstered by the practice of our sister states. To this point, Georgia currently appears to be the only state in which a person must initially apply to a judge for a weapons carry license.[13] And we note as persuasive authority that Delaware's

---

[12] We note that there are weapons-carry-license schemes in other states that require an applicant to possess "good moral character," but non-judges make the determination of whether the applicant has met this prerequisite. See, e.g., Cal. Penal Code § 26150 (a) (1) (determination made by local law enforcement); Me. Rev. Stat. Ann. Tit. 25, § 2003 (1) (determination made by local law enforcement); Del. Code Ann. 11, § 1441 (a) (determination made by the county prothonotary). And, as far as we can tell, there is no authority in these other states supporting the proposition that, because "good moral character" determinations require the exercise of discretion, these law enforcement or county official are performing a judicial function when making such determinations. See, e.g., *Scocca v. Smith*, 912 F. Supp. 2d 875, 887 (II) (D) (N.D. Cal. 2012) (concluding that the sheriff was entitled to qualified immunity on a claim arising from the denial of a weapons carry license).

[13] 39 states require that an applicant apply for such a license to state or local law enforcement. See Ala. Code § 13A-11-75 (a) (2); Alaska Stat. Ann. § 18.65.700 (a) (1); Ariz. Rev. Stat. Ann. § 13-3112 (A); Ark. Code Ann. § 5-73-302 (a); Cal. Penal Code § 26150 (a); Colo. Rev. Stat. Ann. § 18-12-206 (1) (a); Conn. Gen. Stat. Ann. § 29-28 (a); Haw. Rev. Stat. Ann. § 134-2 (a); Idaho Code Ann. § 18-3302 (7); 430 Ill. Comp. Stat. Ann. 66 § 10 (a); Ind. Code Ann. § 35-47-2-3 (a); Iowa Code Ann. § 724.10 (1); Ky. Rev. Stat. Ann. § 237.110 (a); La. Stat. Ann. § 40:1379.1.1 (A) (1); Me. Rev. Stat. Ann. Tit. 25, § 2002-B; Md. Code Ann., Pub. Safety § 5-306 (a); Mass. Gen. Laws Ann. ch. 140, § 131 (d); Minn. Stat. Ann. § 624.714 Subd. 2; Miss. Code. Ann. § 45-9-101 (1) (a); Mont. Code

superior courts were once statutorily assigned the duty of processing weapons-carry-licenses applications and the Supreme Court of Delaware held that superior courts were not performing a judicial function when they considered such applications. See *Application of Buresch*, 672 A.2d 64, 65 (Del. 1996) ("In considering applications for permits to carry concealed deadly weapons, the [s]uperior [c]ourt is engaging in an administrative function delegated by the

Ann. § 45-8-321 (1); Neb. Rev. Stat. Ann. § 69-2430 (1); Nev. Rev. Stat. Ann. § 202.350 (3); N.H. Rev. Stat. Ann. § 159:6 (I) (a); N.J. Stat. Ann. § 2C:58-4 (c); N.M. Stat. Ann. § 29-19-5 (D); N.Y. Penal Law § 400.00 (4-b); N.C. Gen. Stat. Ann. § 14-415.11 (b); N.D. Cent. Code Ann. § 62.1-04-03 (1); Ohio Rev. Code Ann. § 2923.125 (B); Okla. Stat. Ann. Tit. 21, § 1290.3; Or. Rev. Stat. Ann. § 166.291 (1); 18 Pa. Stat. and Cons. Stat. Ann. § 6109 (b); 11 R.I. Gen. Laws Ann. § 11-47-18 (a); S.C. Code Ann. § 23-31-215 (A); S.D. Codified Laws § 23-7-7; Tenn. Code Ann. § 39-17-1351 (b); Tex. Gov't Code Ann. § 411.174 (a); Utah Code Ann. § 53-5-704 (1) (a); Wash. Rev. Code Ann. § 9.41.070 (1); W. Va. Code Ann. § 61-7-4 (a) (1). Three states require that an applicant apply to the state attorney general. See Kan. Stat. Ann. § 75-7c03 (a); Wis. Stat. Ann. § 175.60 (9); Wyo. Stat. Ann. § 6-8-104 (b). Two states require that an applicant apply to the county clerk. See Mich. Comp. Laws Ann. § 28.425b (1); Va. Code Ann. § 18.2-308.04 (D). In Virginia, county clerks may grant permits, but "[o]nly a circuit court judge may deny issuance of a concealed handgun permit. . ." Va. Code Ann. § 18.2-308.08 (A). One state requires that an applicant apply to the county prothonotary (clerk), but the state attorney general appears to have some discretion regarding temporary licenses to nonresidents. See Del. Code Ann. 11, § 1441 (a) (1) and (k). One state requires that an applicant apply to the state department of agriculture and consumer services. See Fla. Stat. Ann. § 790.06 (1) (b). Missouri and Vermont do not appear to have laws concerning weapons carry licenses.

[Delaware] General Assembly."). Because granting or denying an application for a weapons carry license is neither an act that involves resolving a dispute between parties who have invoked the jurisdiction of a court nor an act normally performed by a judge, we conclude that considering such an application is a nonjudicial function, and we overrule any Court of Appeals cases holding otherwise.[14]

Based on the above, granting or denying an application for a weapons carry license does not involve the type of act normally performed only by a judge, and we conclude that such a grant or denial does not involve the exercise of judicial power. See *Sons of Confederate Veterans*, 315 Ga. at 47-48 (2) ("resolving private-rights disputes has been historically recognized as the core of judicial power"). Here, the superior court found that "plac[ing] a probate judge in a position to defend [himself] from civil liability every time [he denies] a weapons permit . . . impedes on a probate judge's independence." This sentiment, of course, is one of the linchpins of

---

[14] See, e.g., *Hise v. Bordeaux*, 364 Ga. App. 138 (874 SE2d 175) (2022).

the doctrine of judicial immunity. See *Forrester*, 484 U.S. at 226-227 (III) ("If judges were personally liable for erroneous decisions, the resulting avalanche of suits . . . would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity . . . would manifestly detract from independent and impartial adjudication."). But this reasoning has no place in interpreting the Separation of Powers Provision when, like here, a judge is performing only a nonjudicial function, there has been no infringement on or usurpation of a judicial function, and there has been no exercise of judicial power.[15] We therefore hold that the Separation of Powers Provision is not implicated by a statute imposing liability for wrongly denying an application for a weapons carry license.[16] See *Word*, 265 Ga. 461, 463 (1) (concluding there was

---

[15] There may be other ways for the Separations of Powers Provision to be violated, but the probate judge makes no other argument.

[16] We note that while the probate judge argued in his brief that granting or denying an application for a weapons carry license was a judicial function, he makes no separation-of-powers argument concerning the assignment of nonjudicial functions to probate courts. We express no opinion on whether the Separation of Powers Provision permits the General Assembly to assign nonjudicial functions to probate courts, much less other classes of courts that lack the probate courts' long history of such assignments.

no violation of the Separation of Powers Provision because there was no "infringe[ment] on any judicial function"); *Northside Manor, Inc.*, 219 Ga. at 300 (concluding there was a violation of the Separation of Powers Provision because there was an "usurpation of exclusive judicial functions").

Accordingly, we reverse the trial court's ruling that OCGA § 16-11-129 (j) violates the Separation of Powers Provision and remand this case for a hearing on costs, including reasonable attorney's fees, under OCGA 16-11-129 (j).[17]

*Judgment affirmed in part and reversed in part, and case remanded with direction. All the Justices concur.*

---

[17] We note that because the costs-and-fees claim is asserted against the probate judge in his official capacity, this claim is against the county. See *Layer v. Barrow County*, 297 Ga. 871, 871 (1) (778 SE2d 156) (2015) ("[A] suit against a county officer in her official capacity is a suit against the county itself.")

LaGrua, Justice, concurring.

I write separately to note that OCGA § 16-11-129 has placed probate judges in a precarious situation because the statute requires that judges consider applicants' criminal history reports, but the judges are powerless to investigate gaps in the information provided in those reports. See *Bell v. Hargrove*, 313 Ga. 30, 34 (3) (867 SE2d 101) (2021) (holding that a probate judge lacks discretion to deny an application for a weapons carry license based solely on a determination that an applicant's criminal history report raises a question about whether the applicant has a disqualifying conviction). While I know the General Assembly recently reestablished the Criminal Case Data Exchange Board, see OCGA § 15-5-24.1, in an attempt to address the large number of missing criminal dispositions, until the State provides complete and accurate records, I fear probate judges face difficult decisions, perhaps impossible ones, in the interim.

I am authorized to state that Justice McMillian and Justice Colvin join in this concurrence.